SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

_____

INDEX NO. 506127/2016

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR
BANC OF AMERICA FUNDING CORPORATION MORTGAGE
PASS-THROUGH CERTIFICATES , SERIES 2006F,                    **VERIFIED ANSWER TO**
                                        Plaintiff,           **UNDATED**
                                                             **FORECLOSURE**
            -against-                                        **COMPLAINT,**
                                                             **COUNTERCLAIMS,**
MICHAEL KRICHEVSKY, et al,                                   **DEMAND FOR TRIAL**
                                        Defendants.          **BY JURY**

_____

C O U N S E L O R S : **"Our courts should not be collection agencies for crooks." — John Waihee,**

**Governor of Hawaii, 1986-1994.**

TAKE JUDICIALNOTICE: that I, Michael Krichevsky, am alive, private man, who is one of the people

of New York. I am domiciled in the material world to wit: geographic area of former Dutch colony

currently known as New York Republic. The change from colony to republic occurred during creation and

signing of Constitution for the united states of America. Man, Michael Krichevsky, therefore stands on the

common law custom and usage jurisdiction of people domiciled in this geographic area. THE STATE OF

NEW YORK is fictitious entity, creation of mind, known as corporation. Alive man, Michel Krichevsky,

is not corporation or 'juristic person'; Michael Krichevsky is not a shareholder, agent or employee of said

corporation; Michael Krichevsky did not knowingly contract with said corporation; Michael Krichevsky

is not a property of this corporation. As such, no nexus between corporation and man exists. Therefore, it

is axiomatic that man, Michael Krichevsky, cannot be a resident of such fiction and anyone claiming to the

contrary is incompetent or trying to perpetrate the fraud upon the court in procuring jurisdiction of THE

STATE OF NEW YORK over me.

2017 MAR -8  PM 4: 53

FILED
KINGS COUNTY CLERK

FILED: KINGS COUNTY CLERK 03/09/2017 09:46 AM          INDEX NO. 506127/2016

NYSCEF DOC. NO. 27          Case 1:20-cv-02343-RRM   Document 5-2   Filed 07/22/20   Page 2 of 49 PageID #: 220          RECEIVED NYSCEF: 03/09/2017

**Declaration of Michael Krichevsky and Rebuttal of 12 Presumptions of the Court**

I, Michael Krichevsky, sui juris, Falsely Accused Claimant (Falsely Accused) hereby rebut 12

presumptions of this court, which I believe will operate as Roman Municipal Court.

I give credit to attorney Melvin Stamper, JD, who publicly disclosed and related the following information

from the book "Fruit from a Poisonous Tree"(available at Amazon, page 58):

*"The scheme also provided for the control of the courts via the 1913 creation of the American Bar*

*Association, whose parent organization was the European International Bar Association, which was the*

*creation of Rothschild. This allowed the International Bankers to control the practice of law, in that the*

*only ones permitted to practice before the courts were those who were educated under their brand of law,*

*which was only Admiralty and Contract law. Common law of the people was to be replaced as it gave the*

*natural man many jurisdictional protections from the bankers' legislation."*

I give credit to Anticorruption Society and Cannon Law researcher Frank O'Collins (one-heaven.org),

who ferreted out these presumptions and helped make them available to the general population. They,

also, pointed out that our so-called 'courts' are run by a private guild by the name of the British

Accreditation Regency.  See: The BAR Card from www.usa-the-republic.com.

**Canon 3228**

A Roman Court does not operate according to any true rule of law, but by presumptions of the law.

Therefore, if presumptions presented by the private Bar Guild are not rebutted they become fact and are

therefore said to stand true [Or as "truth in commerce"]. There are twelve (12) key presumptions asserted

by the private Bar Guilds which if unchallenged stand true being Public Record, Public Service, Public

Oath, Immunity, Summons, Custody, Court of Guardians, Court of Trustees, Government as

Executor/Beneficiary, Executor De Son Tort, Incompetence, and Guilt:

**1.     The Presumption of Public Record** is that any matter brought before a lower Roman Courts is a

Case 1:20-cv-02343-RRM Document 5-2 Filed 07/22/20 Page 3 of 49 PageID #: 221

matter for the public record when in fact it is presumed by the members of the private Bar Guild that the matter is a private Bar Guild business matter. Unless openly rebuked and rejected by stating clearly the matter is to be on the Public Record, the matter remains a private Bar Guild matter completely under private Bar Guild rules; and

2.    **The Presumption of Public Service** is that all the members of the Private Bar Guild who have all sworn a solemn secret absolute oath to their Guild then act as public agents of the Government, or "public officials" by making additional oaths of public office that openly and deliberately contradict their private "superior" oaths to their own Guild. Unless openly rebuked and rejected, the claim stands that these private Bar Guild members are legitimate public servants and therefore trustees under public oath; and

3.    **The Presumption of Public Oath** is that all members of the Private Bar Guild acting in the capacity of "public officials" who have sworn a solemn public oath remain bound by that oath and therefore bound to serve honestly, impartiality and fairly as dictated by their oath. Unless openly challenged and demanded, the presumption stands that the Private Bar Guild members have functioned under their public oath in contradiction to their Guild oath. If challenged, such individuals must recuse themselves as having a conflict of interest and cannot possibly stand under a public oath; and

4.    **The Presumption of Immunity** is that key members of the Private Bar Guild in the capacity of "public officials" acting as judges, prosecutors and magistrates who have sworn a solemn public oath in good faith are immune from personal claims of injury and liability. Unless openly challenged and their oath demanded, the presumption stands that the members of the Private Bar Guild as public trustees acting as judges, prosecutors and magistrates are immune from any personal accountability for their actions; and

5.    **The Presumption of Summons** is that by custom a summons unrebutted stands and therefore one who attends Court is presumed to accept a position (defendant, juror, witness) and jurisdiction of the court. Attendance to court is usually invitation by summons. Unless the summons is rejected and returned,

Case 1:20-cv-02343-RRM   Document 5-2   Filed 07/22/20   Page 4 of 49 PageID #: 222

with a copy of the rejection filed prior to choosing to visit or attend, jurisdiction and position as the accused and the existence of "guilt" stands; and

6.    **The Presumption of Custody** is that by custom a summons or warrant for arrest unrebutted stands and therefore one who attends Court is presumed to be a thing and therefore liable to be detained in custody by "Custodians". [This includes the dead legal fiction non-human "PERSON" that corporate-governments rules and regulations are written for.*] Custodians may only lawfully hold custody of property and "things" not flesh and blood soul possessing beings. Unless this presumption is openly challenged by rejection of summons and/or at court, the presumption stands you are a thing and property and therefore lawfully able to be kept in custody by custodians; and

7.    **The Presumption of Court of Guardians** is the presumption that as you may be listed as a "resident" of a ward of a local government area and have listed on your "passport" the letter P, you are a pauper and therefore under the "Guardian" powers of the government and its agents as a "Court of Guardians". Unless this presumption is openly challenged to demonstrate you are both a general guardian and general executor of the matter (trust) before the court, the presumption stands and you are by default a pauper, and lunatic and therefore must obey the rules of the clerk of guardians (clerk of magistrates court);

8.    **The Presumption of Court of Trustees** is that members of the Private Bar Guild presume you accept the office of trustee as a "public servant" and "government employee" just by attending a Roman Court, as such, Courts are always for public trustees by the rules of the Guild and the Roman System. Unless this presumption is openly challenged to state you are merely visiting by "invitation" to clear up the matter and you are not a government employee or public trustee in this instance, the presumption stands and is assumed as one of the most significant reasons to claim jurisdiction – simply because you "appeared"; and

9.    **The Presumption of Government acting in two roles as Executor and Beneficiary** is that for the

matter at hand, the Private Bar Guild appoints the judge/magistrate in the capacity of Executor while the

Prosecutor acts in the capacity of Beneficiary of the trust for the current matter. Unless this presumption is

openly challenged to demonstrate you are both a general guardian and general executor of the matter

(trust) before the court, the presumption stands and you are by default the trustee, therefore must obey the

rules of the executor (judge/magistrate); and

**10.    The Presumption of Executor De Son Tort** is the presumption that if the accused does seek to

assert their right as Executor and Beneficiary over their body, mind and soul they are acting as an Executor

De Son Tort or a "false executor" challenging the "rightful" judge as Executor. Therefore, the

judge/magistrate assumes the role of "true" executor and has the right to have you arrested, detained, fined

or forced into a psychiatric evaluation. Unless this presumption is openly challenged by not only asserting

one's position as Executor as well as questioning if the judge or magistrate is seeking to act as Executor

De Son Tort, the presumption stands and a judge or magistrate of the private Bar guild may seek to

assistance of bailiffs or sheriffs to assert their false claim; and

**11.    The Presumption of Incompetence** is the presumption that you are at least ignorant of the law,

therefore incompetent to present yourself and argue properly. Therefore, the judge/magistrate as executor

has the right to have you arrested, detained, fined or forced into a psychiatric evaluation. Unless this

presumption is openly challenged to the fact that you know your position as executor and beneficiary and

actively rebuke and object to any contrary presumptions, then it stands by the time of pleading that you are

incompetent then the judge or magistrate can do what they need to keep you obedient; and

**12.    The Presumption of Guilt** is the presumption that as it is presumed to be a private business

meeting of the Bar Guild, you are guilty whether you plead "guilty", do not plead or plead "not guilty".

Therefore unless you either have previously prepared an affidavit of truth and motion to dismiss with

extreme prejudice onto the public record or call a demurrer, then the presumption is you are guilty and the

Case 1:20-cv-02343-RRM Document 5-2 Filed 07/22/20 Page 6 of 49 PageID #: 224

private Bar Guild can hold you until a bond is prepared to guarantee the amount the guild wants to profit from you.

As I am aware of these presumptions, I do not consent to them and declare that I am not a debtor (sinner) or surety in this action, I am, rather, creditor and real party in interest who "injured in fact." I object and challenge these presumptions. I demand 1) a court reporter and a Court of Public Record; 2) a copy of Oath of Office from judge Noah Dear as Public Servant and Trustee of Public Trust, who is being paid by the Public. I demand an explanation of Judge Noah Dear's authority over my property and me, sui juris who does not consent (contract) to these kangaroo court proceedings – as "two cannot walk together unless they agree." This rebuttal is peremptory challenge to Judge Dear whether he is sworn to the BAR first and foremost. Will judge Dear act in capacity of "Public Official," who have sworn a solemn public oath, and remain bound by that oath and therefore bound to serve honestly, impartiality and fairly as dictated by their oath? As such, if judge Dear injures me, he would not be immune from personal liability.

I am returning summons, do not accept the position of defendant and presumption of guilt, and attend under duress in self-defense from criminal acts of plaintiff and its attorneys. As alive man, sui juris, I am not a thing, slave or juristic person in anybody's custody or control. I am not under presumed authority of 'Court of Guardians" in this matter.

I do not accept the office of trustee as a "public servant" and "government employee" just by attending this Roman Court. I am merely visiting by "invitation" to clear up the matter of criminal fraud. As such, I am not a government employee or public trustee in this instance.

Judge Dear is not an Executor appointed by the Bar while plaintiff's attorneys are beneficiaries of the trust in this matter. In fact, as sui juris, I am the general guardian and executor of my property in this matter, which I open to public and trial by jury.

Is judge Dear seeking to act as Executor De Son Tort in that matter? As a private man, sui juris, I have

all of my God given natural rights and authority to be a steward of the land.

Judge Dear is not custodian and I am not a thing or subject. Furthermore, as private man, sui juris, I am competent and over the age of majority. I am not trustee in this matter, but a victim of public corruption by bank attorney, which will be explained in detail below.

Once again, I declare that as sui juris I am competent in law to defend myself in lawful, constitutional common law court of record and reject presumptions that this is going to be BAR's "private lynching" of guilty slave.

For my Verified Answer Under Duress to the Unverified, Undated Complaint, I move all court officers to perform their fiduciary duty to Public and me, and set common law jurisdiction to uphold my God given rights, guaranteed by New York's Constitution.

I, Michael Krichevsky, move this court to take judicial notice if my sui juris status. Due to the breach of peace, harassment and fraudulent, simulated process started by plaintiff and its attorneys, as officers of the court, it does not look like this court is set to operate at law or in equity, I object, notify presiding judge of criminal conduct of unidentified plaintiff and its attorney against me. I aver in self-defense, without prejudice and without waiving any rights to expose these corruption and crime. I aver Under Duress, without voluntarily submitting to fictitious, corporate jurisdiction of this court called New York Unified Court System, I am cautious and presume that this system is set to act as kangaroo court using 12 presumptions of court to violate all of my rights in favor of plaintiff and its attorney. I aver, in the court of record, without waiving any of my natural or other rights and rules as follows:

ANSWERING UNDER DURESS ALL CAUSES OF ACTION

1. I rebut every presumption (disclosed and undisclosed). I generally deny each allegation contained in paragraph numbered 1, 2, 3, 4, 5, 6, 7, 8, 10, 13, 14, 15, 18, 21, 22, and 23 of the Complaint, including that Plaintiff is the owner and holder of the subject mortgage and note, or has been delegated the authority to

institute a mortgage foreclosure action by the owner and holder of the subject mortgage and note. I notice the Public Court that Plaintiff's attorney never pleaded the term 'in due course,' which makes the action suspicious for fraud.

2. Moreover, ¶ 1 is the suspect to me for fraud. In prior litigation attorney for Plaintiff refused to identify the true name and nature of the Plaintiff with similar name and filed motion to discontinue prior action in order to prevent discovery or disclosure of its identity; and prevent me from trial by jury to dismiss prior action with prejudice for lack of standing. Dismissal with prejudice is resolution of controversy on the merits. As such, plaintiff is estopped from bringing any action against me. As such, this action is frivolous and abuse of process.

3. I specifically deny statement in paragraph 2, that I "reside" at my property because such term is not clearly defined and to my knowledge is deceiving as one of the elements of fictitious jurisdiction.

4. I partially admit and partially deny paragraph 18, to wit: I claim to have interest in and lien upon the real property that I own and nobody has a lien or interest superior to mine.

5. I lack information and knowledge sufficient to form a belief as to the truth of the allegations contained in paragraphs numbered 11, 12, 16, 17, 19, 21, and 24 of the Complaint. As such, I demand strict proof.

6. In addition, in this complaint, Plaintiff's attorney changed and Plaintiff's address withheld, which facts I treat as deceitful.

7. There is no man or woman making a verified claim in this action, except myself.

8. As to ¶ 12, it is as vague as to which record Plaintiff's attorney refers. Therefore, I demand an explanation or more particular statement.

9. Accordingly, Falsely Accused demands identification of the Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR BANC OF AMERICA FUNDING CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006F, (US BANK) and authority of its

attorney to represent it. As it stands now, I aver, upon information and believe derived from my personal investigation, that this is a fake, fictitious Plaintiff. Upon information and belief, I aver that plaintiff is a third party unidentified interloper playing a Shell game to plunder my estate.

AS AND FOR A FIRST AFFIRMATIVE DEFENSE – Lack of personal jurisdiction

10. Court lacks personal jurisdiction over the Falsely Accused. Per NY Civil Practice Law and Rules § 308, I was not properly served with process in this action for the following reasons: a) a copy of Summons and Complaint were not handed to me in person, b) a copy of Summons and Complaint were not left at my home with a "person of suitable age and discretion," c) a copy of Summons and Complaint were not attached to my home door, with another copy mailed within 20 days to my home. The process server never saw and asked me whether I was in the military service and what my name was. In addition, due to the unfinished construction of my house, there was no building number anywhere posted and I question how he found me.

11. The attorney for plaintiff, Victoria E, Munian, Esq., made the following false and/or contradictory statements regarding service of process and initiation of this action:

> "1. I am an attorney at law duly licensed to practice in the State of New York, and am affiliated with the law firm of Woods Oviatt Gilman LLP, attorney for plaintiff U.S. Bank National Association, as Trustee for Banc of America Funding Corporation Mortgage Pass-Through Certificates, Series 2006-F in this action.
> 2. I am unable to confirm whether this residential foreclosure action involves a home loan, as such term is defined in Real Property Actions and Proceedings Law § 1304, **as I am presently unable to confirm that the defendants Michael Krichevsky is a resident of the property subject to foreclosure"** [emphasis mine]

12. Affidavit of service states that server personally served me at subject property address and that I have identified myself to process server, thereby creating presumption that I am a resident of property subject to foreclosure (**Exhibit A**).

13. As such, Traverse hearing is required to determine whether Attorney's statement that she is "unable to confirm that the defendants Michael Krichevsky is a resident of the property subject to foreclosure" or

affidavit of service is false. Personally, I believe that attorney herself is aware that proper service was not performed, hence her statement in ¶ 2 that she is "unable to confirm that the defendants Michael Krichevsky is a resident of the property subject to foreclosure" of her certificate of merit.

14. Alternatively, Victoria E, Munian, Esq., believed the process server's affidavit, but made this statement to avoid compliance with Real Property Actions and Proceedings Law § 1304 and other applicable law to mislead the court and take advantage over me. In that case, Victoria E, Munian, Esq. committed attorney misconduct and should be sanctioned, while her complaint dismissed with prejudice.

15. Regardless of the outcome of Travers hearing, both material facts in said affidavit of service and certificate of merit contradict each other and one of them is false, and therefore fraudulent. According to maxim of law, "fraud vitiates all", either affidavit of service is perjury and must be stricken from the court's record and service of process quashed, or certificate of merit is perjury and must be stricken from court's record and complaint dismissed with prejudice.

<u>AS AND FOR A SECOND AFFIRMATIVE DEFENSE – Lack of subject matter jurisdiction</u>

16. That this Court lacks subject matter jurisdiction over the issues raised herein because Plaintiff, inter alia, suffered no damages (there will be more explanation below) and as such, no controversy exists. In order to claim damages, a plaintiff must have suffered "an injury in fact."

17. Plaintiff does not claim damages according to the instant complaint, and therefore it wants my house for FREE without justiciable claim or controversy.

18. The only real party in interest in this matter with "injury in fact" is I as one people, who bailed out banking industry in 2008 to the tune of 280 billion dollars for its corruption.

19. Therefore, complaint must be dismissed with prejudice.

<u>AS AND FOR A THIRD AFFIRMATIVE DEFENSE – Illegal action, Violation of NY State Penal Code,</u>

<u>Judiciary Law §487</u>

Case 1:20-cv-02343-RRM   Document 5-2   Filed 07/22/20   Page 11 of 49 PageID #: 229

20. I incorporate by reference herein all relevant facts stated above.

21. Law prohibits plaintiff to enforce the law by violating another law.

22. All Plaintiffs' attorneys violated and continue violate ethics, disciplinary rules and Judiciary Law §487, which is a crime, and therefore prior and this actions are illegal.

23. I am harassed and compelled by plaintiff's attorney into expenses, laboring and defending my rights without knowing what I did wrong. Who or what "U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR BANC OF AMERICA FUNDING CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006F" is as named plaintiff on the caption of this complaint? This plaintiff's name is gibberish called "DOG-LATIN: The Latin of illiterate persons; Latin words put together on the English grammatical system" – Black's Law Dictionary 4th Edition (page 569). It is an old trick known to our Founding Fathers. From letter of Thomas Jefferson to John Adams:

> "I had supposed them defunct with the society of Jesuits, of which they were: and that their works, although above ground, were, from their bulk and insignificance, as effectually entombed on their shelves, as if in the graves of their authors. Fifty-two volumes in folio, of the acta sanctorum, in dog-Latin, would be a formidable enterprise to the most laborious German."

24. Plaintiff's name is also a "GLOSSA VIPERINA EST QUIE CORRODIT VISCERATEXTUS. 11 Coke, 34. It is a poisonous gloss which corrupts the essence of the text." – Black's Law Dictionary 4th Edition (page 820). It looks just like English, but grammatically is wrong, upper case styled Dog-Latin – foreign text.

25. The way I learned English, is that after 'coma' goes another name on the caption of the form. Here is how I see it:

26. First plaintiff's name is U.S. BANK NATIONAL ASSOCIATION. The second plaintiff's name is AS TRUSTEE FOR BANC OF AMERICA FUNDING CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES. The third plaintiff's name is SERIES 2006F. According to English grammar rule, there

INDEX NO. 506127/2016
Case 1:20-cv-02343-RRM  Document 5-2  Filed 07/22/20  Page 12 of 49 PageID #: 230
RECEIVED NYSCEF: 03/09/2017

are three plaintiffs on the caption of this action.

27. Accordingly, plaintiff does not and cannot lawfully exist as one (1) fiction of law such as corporation or trust. Attorneys in prior and in this actions committed perjury by, inter alia, stating in prior and in instant complaint under penalty of perjury that plaintiff is a "national association duly organized…", etc.

28. I asked prior plaintiff's attorneys in prior action to identify plaintiff and they refused.

29. I asked prior plaintiff's attorneys who hired them and they refused to answer.

30. Current Plaintiff's attorney, Victoria E, Munian, Esq., writes in the certificate of merit: "1. I am an attorney at law duly licensed to practice in the State of New York, and am affiliated with the law firm of Woods Oviatt Gilman LLP, attorney for plaintiff U.S. Bank National Association, as Trustee for Banc of America Funding Corporation Mortgage Pass-Through Certificates, Series 2006-F in this action."

31. She further writes that "On April 6, 2016 I consulted about the facts of this case with the following representatives of plaintiff: Daniel V. Edward, Vice President of Loan Documentation."

32. On March 1, 2017, I called Plaintiff's attorney office and asked for information about Plaintiff. No one could find any information such as mailing address of telephone number of Plaintiff in firm's computer system.

33. Staff member directed me to call Wells Fargo at 800-416-1472. No one at this number was able to help me and worker there directed me to call Wells Fargo at 866-234-8271. No one at that number would identify Plaintiff and give me any contact information.

34. Based on the foregoing, I aver that U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR BANC OF AMERICA FUNDING CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006F national association does not exist, and therefore demand its articles of organization or formation together with information from the federal territory or state under which it registered.

35. In addition, I conclude that some shadow entity together with attorneys conspired and knowingly

engaged in criminal fraud, harassment and plunder of Falsely Accused's estate using the court as

confidence game or weapon of crime.

36. Who or what "MICHAEL KRICHEVSKY" is as named defendant on the caption and documents

(attached) of this action styled in upper case DOG-LATIN? From Wikipedia, the free encyclopedia:

> *"Not to be confused with Pig Latin.*
>
> **Dog Latin**, also known as **Cod Latin**, **macaronic Latin**, **mock Latin**, or **Canis Latinicus**,[1] refers to the creation of a phrase or jargon in imitation of Latin,[2] often by "translating" English words (or those of other languages) into Latin by conjugating or declining them as if they were Latin words. Unlike the similarly named language game Pig Latin (a form of playful spoken code), Dog Latin is more of a humorous device for invoking scholarly seriousness.
> Sometimes "dog Latin" can mean a poor-quality attempt at writing genuine Latin.[3]"

37. Now, I want to start a counter-claims and third-party claims of abuse of process and malicious

prosecution against U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR BANC OF

AMERICA FUNDING CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES, SERIES

2006F, but unable to find a real, physical mailing address to serve process. I am unable to find a name of

man or woman who runs plaintiff as company – one more proof from Google search that plaintiff does not

exist.

38. Based on the foregoing, presumption that plaintiff and its attorneys are credible and trustworthy

destroyed. Plaintiff has to state and prove on the record all details of the prior transactions between alleged

plaintiff or its agents, predecessors or nominees and Falsely Accused starting from application for an

alleged loan and consequent contract. If there was no loan to me – the will be no debt to enforce and

current action is robbery even though it happens in courtroom with presiding judge.

39. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A FOURTH AFFIRMATIVE DEFENSE – Lack of standing and capacity to sue

Case 1:20-cv-02343-RRM Document 5-2 Filed 07/22/20 Page 14 of 49 PageID #: 232

40. I incorporate by reference herein all relevant facts stated above.

**Plaintiff and its attorneys engaged in the deception of who is really foreclosing on my home**

41. I do not know whom or what alleged plaintiff is, and therefore at loss and harassed to answer as to all available or applicable affirmative defenses and am frivolously compelled to guess, or waive my rights, or become frivols litigant by alleging everything under the sun. As I analyze prior actions of alleged plaintiff and its attorneys, I conclude that plaintiff is not a real party in interest or had standing to initiate prior foreclosure, which plaintiff voluntarily discontinued in 2016.

42. Accordingly, Plaintiff bears the burden of establishing standing. To establish standing, a plaintiff must have suffered "an injury in fact" – a violation of a legally protected right or interest which is a) concrete and particularized, and b) actual or imminent, not conjectural or hypothetical.

**The rubber stamps that plaintiff used on attached notes are fake and without dates**

43. Plaintiff, upon information and belief derived from prior and this actions' exhibits and filings (**Exhibits B** and **C**, shown only last pages with stamps and signatures), has no standing. As explained below, plaintiff cannot prove that it owns the *original* note and mortgage, or has been delegated the authority to institute a mortgage foreclosure action by the owner and holder of the *original* subject mortgage and note *at the time it initiated prior and this actions.* I notice the court that Plaintiff's attorney never pleaded the term 'holder in due course,' which makes the action suspicious for fraud. In case of fraud, plaintiff cannot suffer any damages or claim any right.

44. As can be seen from these exhibits of plaintiff's own documentary evidence (**Exhibits B** and **C**), they are different and therefore inconsistent as there cannot be two *original notes* for one loan.

45. For example, former exhibit does not have two stamps ("U.S. Bank National Association as Trustee" the rest is not legible) that the later has. In addition, on the latter "LOAN NO.:" and "MIN NO." both redacted for unknown and unexplained reasons, inferring that plaintiff has something to hide. This makes

Case 1:20-cv-02343-RRM   Document 5-2   Filed 07/22/20   Page 15 of 49 PageID #: 233

these notes inconsistent as failed forgeries. I also infer that there are two different loan numbers and MIN numbers, which is the reason for reduction or black out of these numbers on **Exhibit C**. To prove perjury, one has to show the court that affiant made two inconsistent statements of material fact under oath without proving which statement is actually false. In this instance the inconsistent statements also accompanied by different notes. Accordingly, I do not have to show the court which exhibit of the note is false or which note fake and is forgery. I presume therefore that they are both forgeries because they both came from the same source – upon information and belief, from self-proclaimed mortgage servicer Wells Fargo Bank or its subsidiaries. Wells Fargo is notorious for fabricating foreclosure documents and lately was caught fabricating bank accounts using stolen from its customers identity and electronic signatures using its patent, **Exhibit D**. Accordingly, both alleged *original* notes most likely are void as forgeries by electronic signatures.

46. I also notice similarities in these notes – they both lack signatures of corporate officers next to mine and lack dates of endorsements. They fail to show a chain of title. These stamps fail to show which entity endorses the note to which and when – a necessary element to show that plaintiff owned the note before starting the action. The stamp on top right corner of both notes purportedly shows that Steven Rimmer, Sr. Vice President of Fairmont Funding Ltd endorsed this note to Wells Fargo Bank without recourse. It is not clear which Wells Fargo Bank, as there are at least a few corporations with similar names such as "Wells Fargo Bank, N.A." Regardless, stamp without a date is open to guesswork and attack, and therefore nullity.

47. In addition, my purported signature is not notarized and without a date as well, which would allow signature page be multiplied and attached to any other piece of paper. As such, anybody can conveniently fabricate foreclosure documents including perjurious affidavits with impunity, which is the intention of such design of fabrication. The bottom line – signature on a contract document without a date is nullity.

48. Lastly, these notes do not show how Banc of America or plaintiff connected to Wells Fargo Bank and when "connection" occurred – a necessary element to have standing to file complaint.

49. Based on the foregoing, plaintiff cannot prove that I signed any one of these notes that plaintiff claims to own, which I believe it cannot due to the above obvious inconsistencies and evidentiary gaps. My presumed by them original signature could be easily obtained from any scanned with my signature document and electronically stored in database for years. Then, this signature could be mechanically placed on any created by bank note using sold by banks devices that mechanically mass place signatures on payroll checks, etc. This is what I believe Wells Fargo is doing to mass fabricate mortgage documents using their notorious mortgage foreclosure manuals and patents.

50. Alternatively, is there more fraud inferred against my name by implying that I had two loans from the lender or from two lenders, hence two original notes and two foreclosure actions on one property?

51. Did lender(s) buy two PMI policies with these two notes and therefore claimed insurance policies?

52. Did plaintiff or someone associated with it steal my identity?

53. How many "rabbit holes" are there? Plaintiff says nothing about the way it obtained the ownership of the note or any right to foreclose. Plaintiff makes unsubstantiated claims of ownership without pleading about chain of title. In allegations of the complaint, there is unexplained gap between the alleged assignments and plaintiff. Therefore, plaintiff fails to prove that it has standing to sue because it was not the *legal* owner of the *original* note and/or mortgage with my *authorized* signature, or has been delegated the authority to institute a mortgage foreclosure action by the lawful owner and holder of the subject mortgage and note at the time it commenced this foreclosure lawsuit.

54. Alternatively, unidentified Plaintiff – as shadow entity was/is trading fake, forged notes and mortgages with other corporate entities using void, fraudulent assignments as instruments of confidence game to bamboozle the court in order to foreclose on my property.

55. Assignment of mortgage in 2009 and corrective assignment of 2013 are both void for fraud as

Fairmont Funding Ltd went out of business in 2007. It was not, to my knowledge, succeeded by any entity.

Plaintiff, too, does not state that Fairmont Funding Ltd had any successors. Accordingly, MERS could not

be a nominee of non-existing entity and therefore did not have authority to assign anything at that time.

56. Plaintiff's attorney knew or should have known that these notes, mortgages and assignments fake – yet

knowingly certified as original and filed them in the court's record. Plaintiff's attorney expects that this

court assist their criminal conduct to plunder my estate. As such, Falsely Accused demands discovery and

forensic investigation of criminals involved.

57. Moreover, ¶ 1 of this Complaint is the suspect to me for another reason stated below. In prior

litigation, attorney for Plaintiff Frenkel, Lambert, Weiss, Weisman & Gordon, LLP, refused to disclose

and identify the true name and nature of the Plaintiff with similar name "US BANK NATIONAL

ASSOCIATION, AS TRUSTEE, FOR MORTGAGE PASS-THROUGH CERTIFICATES, SERIES

2006-F, 3476 Stateview Boulevard, Fort Mill, SC 29715" and asked the court's permission to change

caption to NATIONAL ASSOCIATION, AS TRUSTEE FOR BANC OF AMERICA FUNDING

CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006F. This time they

removed the address and added Banc of America without explaining the reason why. I opposed stating

that attorneys are trying to switch two different entities and manipulate names on the note. I also raised the

defense of fraud. Instead of deciding this issue on the merit, they filed motion to discontinue prior action.

I believe they did it in order to make my cross-motion to dismiss moot, which they specifically stated to

Hon. Bert Bunyan. Their motion to discontinue action therefore prevented me from trial by jury to dismiss

prior action with prejudice. Dismissal with prejudice is resolution of controversy on the merits and I

presume Plaintiff tried to avoid such outcome. Plaintiff's attorney asked me not to oppose that motion and

implied to let them "save their face." I agreed without knowing that they were deceiving me by planning to

change the judge, who was, in my opinion, impartial by upholding the rule of law and due process.

58. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A FIFTH AFFIRMATIVE DEFENSE – Statute of limitation and laches

59. I incorporate by reference herein all relevant facts stated above.

60. Plaintiff with its attorneys were not credible and trustworthy as evidenced by prior and this actions, which is why presumption that plaintiff and its attorney are credible and trustworthy must be erased. In prior action, alleged Plaintiff abandoned foreclosure in 2010 due to New York Attorney General and US Attorney investigations of major banks-servicers with their foreclosure mill attorneys, and consequent settlements of fraudulent foreclosures by the banks and attorneys. Now, Plaintiff instituted this action more than 6 years after the alleged cause of action in the instant Complaint accrued, and therefore is barred by the Statute of Limitations.

61. Plaintiff had ample time to complete prior action. Accordingly, this action is time-barred due to defendants' common-law laches.

62. In addition, Per NY Civil Practice Law and Rules § 213(4), Plaintiff may not sue on all or part of the alleged mortgage debt because Plaintiff commenced this action more than six years after the alleged debt became due. Therefore, this action is barred by the Statute of Limitations.

63. Plaintiff contradicts itself. According to Plaintiff's own AFFIDAVIT OF MERIT AND AMOUNTS DUE AND OWING from prior action, *default and notice of acceleration* started on May 1, 2009. In this notice (**Exhibit E**), it says that Falsely Accused is in default and if it will not be cured by August 11, 2009, Wells Fargo Home Mortgage will accelerate the note and mortgage. Thereafter, on or about September October of 2009, Steven J. Baum, P.C. initiated foreclosure. Per my calculations, 6 years expired on March 31, 2015.

64. Therefore, according to plaintiff's own documentary evidence, the entire foreclosure action is

time-barred by the statute of limitations because Plaintiff commenced this action more than six years after

it accelerated the mortgage debt. Falsely Accused requests that the mortgage be cancelled and discharged

pursuant to NY Real Property Actions and Proceedings Law § 1501(4).

65. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A SIXTH AFFIRMATIVE DEFENSE – Judicial Estoppel

66. I incorporate by reference herein all relevant facts stated above.

67. Plaintiff, in prior and in this actions, made inconsistent statements of fact and produced 2 different

versions of the so-called original mortgage and note in connection with the ownership and right to enforce

the note and mortgage. Now, Plaintiff must be estopped from offering into evidence second version of

"original" note, mortgage and assignment.

68. In addition, in prior action, plaintiff produced a notice of default and acceleration with affidavit of

merit (**Exhibit E**) that showed the date of default May1, 2009. In that affidavit of merit, employee of

Wells Fargo stated:

> "8. Based on the default. Plaintiff elected to call due the entire unpaid principal balance
> together with interest and disbursements, including reasonable attorney fees and costs,
> allowable under the terms of the Promissory Note and Mortgage,"

69. In this action, Plaintiff vaguely alleges that notice of default was sent on December 22, 2015. It is

obvious that plaintiff is trying to weasel out of blown six years statute of limitation (run on March 31,

2015) of this action when plaintiff voluntarily discontinued prior action without explanation.

70. Accordingly, plaintiff must be estopped from changing its statements under penalty of perjury.

71. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE – No Notice of Default by Note Holder and

Lender

72. I incorporate by reference herein all relevant facts stated above.

73. Plaintiff failed to comply with the requirements for the notice of default in alleged mortgage loan

Case 1:20-cv-02343-RRM   Document 5-2   Filed 07/22/20   Page 20 of 49 PageID #: 238

agreement, a condition precedent to this foreclosure action.

74. According to paragraph 7 (C) of the alleged loan agreement (Note) attached to this complaint, the Note Holder sends out notice of default.

75. Even if, which is not admitted and stated only for the sake of argument, Plaintiff is real party in interest with right to foreclose as lender/creditor and I owe Plaintiff money, I never received notice of default from U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR BANC OF AMERICA FUNDING CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006F. As such, Plaintiff failed to comply with condition precedent in the alleged contract agreement.

76. In addition, according to ¶ 22 of the mortgage, Lender sends out Notice of Default. As of today, I still did not get such notice from Lender.

77. Therefore, complaint must be dismissed with prejudice.

AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE – Accord and Satisfaction by Securitization and assumption of risk

78. I incorporate by reference herein all relevant facts stated above.

79. Plaintiff is speaking hypothetically using the words in prior complaint and in this complaint such as "trustee," "pass-though," and "certificates 2006-F." By doing so, Plaintiff's attorneys implied or created presumption that the loan in question was securitized, i.e. packaged with other loans as commodities and sold on Wall Street *en mass*. Securitization is a process by which loans are packaged for sale to investors on Wall Street in much the same manner as stocks so that when investor buys shares of stock they stored electronically with a broker without particular "ID Number" to identify any particular share and, most of the time, without physical delivery of shares.

80. Based on the foregoing, I allege that there could be no Debt, Loan(s), and/or Promissory Note(s) or Mortgage(s) relative to, hypothecated, or that which traces to subject property, nor is there in existence

Case 1:20-cv-02343-RRM   Document 5-2   Filed 07/22/20   Page 21 of 49 PageID #: 239

any individual or entity who could *without absurdity make non-frivolous claim* to be a "Note Holder" of

any such Debt, Loan(s), and or Promissory Note(s) or Mortgage(s). As such, no Named or Un-known

individual or entity could identify, within commodity, and present *without absurdity non-frivolous claim*

adverse or otherwise as to any Rights, Title or Interests in my property. Once again, without verification of

particular parties to this action, I present proposition that concerns securitization, which itself naturally

creates inability to identify the holder of a loan or note as a matter of law and fact. As a result of the

implied securitization separating a note as commodity and mortgage, "any and all Rights, Title, and or

Interests to my property," allegedly held by any of the Named or Un-known parties had been canceled,

extinguished, relinquished, discharged, and/or detached, including a right to foreclose as to any and all

alleged notes and mortgages referenced herein. In addition, I allege that because of the implied

securitization and assignment to securities trust, the subject 'Secured Mortgage' then became 'Null & Void'

by Operation of Law.

81. Alternatively, I further allege that the implied securitization process has resulted in a full satisfaction

of the mortgage, and plaintiff's alleged interests legally have been canceled, extinguished, terminated,

and/or discharged.

82. This further explains Plaintiff's inability to claim and/or show any damages in its complaint as

plaintiff profited from securitization, bailouts and/or from defrauding investors beyond imagination.

83. Alternatively, the alleged debt has become unsecured by Operation of Law due to separation of

securitized Note and Mortgage. Therefore, none of the parties claiming any rights under mortgage has

enforcement rights against my home as there is no individual or entity that can legally authorize

foreclosure.

84. Additionally and alternatively, presumed securitization was illegal or unlawful, or was fraudulently

performed to defraud investors, which resulted in huge losses to investors such as pension funds. There

was in fact a Non-Compliance with the terms and provisions of TILA, RESPA, REMIC and "Servicing and Pooling" Agreement. Therefore, allegedly "any and all Rights, Title and Interests" in my property, for and on behalf of all Named and Un-known parties have legally been canceled, extinguished, terminated, and/or discharged as punishment for non-compliance by Operation of Law.

85. Further and Alternatively, Plaintiff or any Named and Un-known parties through implied securitization converted secured by mortgage debt into high risk unsecured derivative instruments, cdos, hedges, etc, and gambled with them on Wall Street.

86. Accordingly, any possible damages implied to have been sustained by the Plaintiff, if indeed sustained, were sustained while the Plaintiff was intentionally planning to get involved in an activity *undisclosed and concealed* from me before an alleged contract agreement with me was made.

*87.* Plaintiff or its agent *concealed* from me that it intends to *induce* me to enter into such activity using my *identity, signatures, notes and assignments* with full knowledge of the potential hazard thereof. The inherent risk incident to such activity and any damages flowing therefrom were expected and assumed upon entering into and continuing such activity of securitization and gambling with derivatives – *without my knowledge and consent.*

88. Plaintiff's attorneys are well aware of these rules and regulations of securitization, yet committed attorney's misconduct and outright fraud by starting this action and attempting to plunder my estate.

89. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A NINTH AFFIRMATIVE DEFENSE – fraud/constructive fraud/forgery/perjury

90. I incorporate by reference herein all relevant facts stated above.

91. Even if, which is not admitted and stated only for the sake of argument in defense, there is presumption that I signed the subject note – this note is not an evidence of the loan since note can be fabricated as I explained above and below. Because it is impossible for me to prove a negative by

documentary evidence – the burden of proof that I received a loan is on plaintiff to step forward with admissible documentary evidence of the loan, including HUD-1 statement.

92. Purported assignment of mortgage from MERS to plaintiff is perjury or forgery, or both. Upon my personal investigation and belief, Fairmont Finding Ltd, if it purportedly was in possession of my Note and Mortgage in 2005, due to implied securitization, should have sold its rights to Note and Mortgage to other parties in the chain of purported securitization in 2005-2006 through MERS. Consequently, MERS knew in 2009 that Fairmont did not have any rights to these alleged Note and Mortgage, hence no authority to assign any mortgage by MERS.

93. In 2007, upon my investigation, Fairmont Finding Ltd was sued for fraud by UBS Securities, became insolvent, banker license was terminated by the state and Fairmont closed its business in 2007. Elpiniki M. Bechakas (Bechakas), who purportedly signed this assignment of mortgage to plaintiff, was not Assistant Secretary and Vice President of MERS as assignment deceitfully states. In fact, she was New York attorney working for Steven J. Baum, P.C. – foreclosure mill, which was disbanded in 2010-2011due to fraud and fabrication of documents for foreclosure cases. Bechakas permitted numerous Robo-signers from this firm to fabricate assignments of mortgage and sign them using her name, which is why the whole firm was disbanded after was caught.

94. Attached to this complaint assignment of mortgage allegedly signed by Bechakas is a logical impossibility. She purportedly signed it on August 25, 2009. Little did she know that MERS did not have authority to assign mortgage from corporation that ceased to exist in 2007. As such, I infer that this assignment of mortgage is fabrication, and therefore null and void.

95. Because said assignment of mortgage was void ab initio, no subsequent, corrective assignment can cure the defect, and therefore corrective assignment is void as well.

96. Attorney certification of "original note" is fraud upon the court by officer of the court as shown above.

97. In addition, certification is fraud due to egregious conflict of interest in violation of 'advocate-witness' rule and due to self serving statement by the agent of the plaintiff-corporation – inadmissible per hearsay rule.

98. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A TENTH AFFIRMATIVE DEFENSE – Statute of frauds

99. I incorporate by reference herein all relevant facts stated above.

100. The statute of frauds bars plaintiff's claims. Plaintiff caries burden of proving that lawful, written contract exists. The alleged note and mortgage attached to the complaint does not have notary signature and seal after my alleged signature, and as such contains no witnesses or witnessing that I signed said instruments attached to the complaint. Any student familiar with a software program such as PHOTO SHOP can electronically create any note or mortgage using my scanned signature obtained somewhere else.

101. Interestingly, there is no signature to the contract from representative of Fairmont Finding Ltd.

102. Who allegedly sat down with me at the table on the day of closing?

103. Where is the signature of the officer of Fairmont Finding Ltd next to mine?

104. It is not there because I would easily prove perjury by deposing that man or woman.

105. The same question goes to purported assignments of mortgage. Where are two signatures of corporate officers during event of assignment?

106. As I explained above, this practice of forgery by Wells Fargo bank and others is well known and documented. It was used on others and on me before and failed.

107. Therefore, complaint must be dismissed with prejudice.

AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE – Accord and satisfaction from insurance company and/or other third party

108. Due to implied securitization of the alleged loan and note, Plaintiff, U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR BANC OF AMERICA FUNDING,CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006F, was paid or reimbursed from Personal Mortgage Insurance (PMI) insurance policy by undisclosed third party or parties in whole or in substantial part for the alleged default.

109. Alternatively, Plaintiff was reimbursed by credit default swaps or other derivative insurance product.

110. To verify these statements, several questions must be answered. Is US BANK a trust? If it is, then there is no Plaintiff here. Who is beneficiary? Who is creditor? Who is lender? Who is investor? Who is holder in due course? Who is US BANK – securitized trust, custodian or beneficiary? As such, Falsely Accused demands discovery.

111. In addition, Plaintiff was reimbursed by bailouts of banks by Federal Government with my taxpayer's money, and therefore did not suffer any loss from the alleged default. Accordingly, Falsely Accused does not owe Plaintiff any money.

112. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE – Invasion of privacy

113. I incorporate by reference herein all relevant facts stated above.

114. Plaintiff, its agents, predecessors and/or assignees used my name, documents, signatures, property and personal information for profit in commerce, such as securitization and investment purposes without my knowledge and consent.

115. They failed to disclose their true intent, which made transaction with me unlawful and void.

116. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE – Failure to mitigate damages

117. I incorporate by reference herein all relevant facts stated above.

INDEX NO. 506127/2016
RECEIVED NYSCEF: 03/09/2017

118. If Plaintiff is the real party in interest and I owe any money, it has failed to use available means to mitigate damages. As I can judge by analyzing complaint, plaintiff failed to mitigate damages.

119. Plaintiff had a duty to apply for its remedies from IRS by writing off an alleged default and/or by taking income tax deduction of all or substantial part of the alleged loss, and therefore I do not owe plaintiff any money or as much as it alleges in the complaint.

120. As such, an accounting was necessary to proof their claim, which they did not produce.

121. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE – Waver

122. I incorporate by reference herein all relevant facts stated above.

123. That if the Plaintiff had any lawful claim against my property and/or me, or sustained any damages as implied, Plaintiff's own waver waived such claim for damages when it filed motion for voluntary dismissal of prior action.

124. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE – Unclean hands

125. I incorporate by reference herein all relevant facts stated above.

126. Plaintiff has unclean hands. In prior actions and in this one, Plaintiff and its agents conspired with each other to act in bad faith. Plaintiff made numerous false and inconsistent, misleading statements of material facts and documents, which its attorneys and agents entered in court record.

127. Plaintiff and its agents harassed me by litigation from 2009 until present, and at the end of prior action voluntarily dismissed it.

128. Plaintiff's agents threatened and harassed me and other occupants of the property by breaking the gate lock and attempting to break into my apartment, which resulted in 911 calls to police.

129. Knowing that the property is occupied, plaintiff's agents, numerous times, posted signs on the gate

Case 1:20-cv-02343-RRM   Document 5-2   Filed 07/22/20   Page 27 of 49 PageID #: 245

that agent examined property and determined that it is not occupied.

130. Agent left only some abbreviated ID on the sign, which would not allow me to trace who it was personally.

131. On another occasion, plaintiff's agents trespassed on my property and started what it appeared to me doing "property survey" without my permission. They refused to identify who they were, which resulted in the call to police. Immediately thereafter, they left.

132. In addition, in this action Plaintiff's attorney committed attorney's misconduct by making false, misleading the court statements, thereby harassing me as well.

133. Therefore, complaint must be dismissed with prejudice.

AS AND FOR A FIRST COUNTERCLAIM – Malicious prosecution

134. I incorporate by reference herein all relevant facts stated above.

135. Plaintiff was and continues maliciously prosecuting Falsely Accused since 2009. The first foreclosure action against me ended in my favor in 2016. Plaintiff slandered the title to my property while I was doing construction on it, thereby destroying my credit, ability to finance it and sell. This caused me hardship and rendered me unable to continue development of the property that I started in 2009. This, in turn, resulted in lost profits until today.

136. In 2016, first foreclosure action ended in my favor by plaintiff's attorney motion to discontinue, which was unopposed by me and granted.

137. As the direct and proximate result of the above, I was damaged, continued to be damaged and will be damaged in the future.

138. It is impossible to determine the exact amount of damages because prosecution continues into its second stage – new, false and fraudulent action, which plaintiff started again in 2016. However, my rough estimate of damages would be at least $2,000.000.

139. Plaintiff and its agents acted in concert, wantonly and intentionally with malice and harassment.

Therefore, I demand judgment awarding damages, punitive and treble damages in the amount to be

determined at trial.

TRIAL BY JURY DEMANDED

140. Falsely Accused demands trial by jury on all issues so trial able at law.

WHEREFORE, the Falsely Accused demands judgment dismissing the complaint, granting counterclaim,

granting the costs and disbursements of this action and for such other and further relief as to this Court

may seem just and proper.

## INDIVIDUAL VERIFICATION

STATE OF NEW YORK)
                           ) ss.:
COUNTY OF KINGS    )

    Michael Krichevsky, sui juris, being duly sworn to God, deposes and says:
    That I am the Falsely Accused in the within action.
    I have drafted the foregoing Answer with Counter-claim and know the contents thereof and the same is true to the best of my knowledge, except as to those matters herein stated to be alleged upon information, belief, and that as to those matters, I believe them to be true.

                Under duress, Michael Krichevsky, sui juris
                4221 Atlantic Ave
                Brooklyn, New York 11224
                (718) 687-2300

Sworn to before me this
8th of March 2017

                  ALEX TE
            Notary Public – State of New York
              No. 01TE6243864
           Qualified in Queens County
        Commission Expires June 27, 2019
NOTARY PUBLIC

Woods Oviatt Oilman LLP
700 Crossroads Building
2 State Street
Rochester, NY 14614

PROVEST, LLC
320 CARLETON AVE, STE 2600
CENTRAL ISLIP, NY, 11722
(631) 666-6168

WOODS OVIATT GILMAN, LLP
700 CROSSROADS BLDG
ROCHESTER, NY 14614

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS                                INDEX # 16-506127

U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR
BANC OF AMERICA FUNDING CORPORATION MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES 2006-F,

                                    Plaintiff,

                Against                                  AFFIDAVIT
                                                         OF SERVICE

MICHAEL KRICHEVSKY, ET AL
                                    Defendants,

STATE OF NY    COUNTY OF KINGS

Woody Dorsonne being duly sworn, deposes and says: that deponent is not a party to this action, is over 18 years of age
and resides in the State of NY.

That on June 17, 2016 at 9:30PM at 4221 ATLANTIC AVENUE, 2ND FLOOR, A/K/A 4219-4221 ATLANTIC
AVENUE, BROOKLYN, NY 11224, deponent served the within NOTICE REGARDING AVAILABILITY OF
ELECTRONIC FILING & SUMMONS FORECLOSURE ACTION & FORECLOSURE COMPLAINT AND DEBT
VALIDATION LETTER which contains the additional notice requirements in accordance with RPAPL §1320, along
with a copy of the Homeowner's Foreclosure Notice as required by RPAPL §1303, which notice was printed on a
colored piece of paper, which color differed from that of the color of the NOTICE REGARDING AVAILABILITY OF
ELECTRONIC FILING & SUMMONS FORECLOSURE ACTION & FORECLOSURE COMPLAINT AND DEBT
VALIDATION and the notice was in bold, fourteen-point type, with the title of the notice in bold, twenty-point type ,
and Certification with exhibits as required by CPLR §3012-B bearing index # 16-506127, filed 04/18/2016 on
MICHAEL KRICHEVSKY, defendant therein named,

**INDIVIDUAL**

| X |

by delivering thereat a true copy of each to said defendant personally, deponent knew said
person so served to be the person described as said defendant therein. (S)He identified (her)
himself as such.

**DESCRIPTION**

Deponent describes the individual served to the best of deponent's ability at the time and
circumstances of service as follow:

| Sex | Skin Color | Hair Color | Age (Aprx) | Height (Aprx) | Weight (Aprx) |
|-----|-----------|-----------|-----------|--------------|--------------|
| M | WHITE | SALT/PEPPER | 60 | 5'9 | 180 |

**USE IN NYC
CIVIL CT.**

The language required by NYCRR 2900.2(e), (f) & (h) was set forth
on the face of said summons(es)·

**MILITARY
SERVICE**

| X |

I asked the person spoken to whether the defendant was in active military service of the
United States or of the State of NY in any capacity whatever and received a
negative reply. The source of my information and the grounds of my belief are the
conversations and observations above narrated. Upon information and belief I aver that the
defendant is not in the military service of NY or of the United States as that term is defined in
either the State or Federal statutes.

SWORN TO BEFORE ME ON    6-24-16

KAREN KANE
Notary Public, State of New York
No 01KA6096127
Qualified in Nassau County
Commission Expires December 04, 2019

LICENSE # 2033315
FILE # 20160296
CASE ID # 4580095

Exhibit A

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
                         -Borrower
MICHAEL KRICHEVSKY

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

PAY TO THE ORDER OF Wells Fargo Bank · N.A.
WITHOUT RECOURSE              (Seal)
                           -Borrower
BY: _____
Steven Rimmer, Sr. Vice President
Fairmont Funding, Ltd.        (Seal)
                           -Borrower

_____ (Seal)
                         -Borrower

**US BANK NATIONAL ASSOCIATION AS TRUSTEE FOR BANC OF AMERICA FUNDING CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES (Sign Original Only) SERIES 2006-F

WITHOUT RECOURSE
PAY TO THE ORDER OF
        **
WELLS FARGO BANK, N.A.
BY _____
Joan M. Mills, Vice President

MULTISTATE INITIAL INTEREST ADJUSTABLE RATE NOTE - 1-Year LIBOR Index (Assumable after Initial Period) - Single Family - Freddie Mac UNIFORM INSTRUMENT
DOCPREP SERVICES, INC. FORM - MSSSTN-8664        Page 5 of 5              Form 5537 5/04 (rev. 7/05)
LOAN NO.: CS1848                                ORIGINAL    MIN NO.: 100294800012018483

E h i b i t B

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                   PAY TO THE ORDER OF   Wells Fargo Bank · N.A.
                          -Borrower                WITHOUT RECOURSE                    (Seal)
MICHAEL KRICHEVSKY                                                                   -Borrower
                                                   BY· _____
                                                   Sharon Rimmer, Sr. Vice President
                          (Seal)                   Fairmont Funding, Ltd.             (Seal)
                          -Borrower                                                  -Borrower


_____ (Seal)                   _____ (Seal)
                          -Borrower                                          -Borrower
**US BANK NATIONAL ASSOCIATION AS TRUSTEE FOR BANC OF AMERICA
FUNDING CORPORATION MORTGAGE PASS-THROUGH CERTIFICATES (Sign Original Only)
SERIES 2006-F

                              WITHOUT RECOURSE
U.S. Bank National Association as trustee for PAY TO THE ORDER OF
holders of Banc of America Funding Corporation       **
Mortgage Pass-Through Certificates, Series   WELLS FARGO BANK, N.A.    U.S. Bank National Association as trustee for
   without recourse.              BY Joan M. Mills    holders of Banc of America Funding Corporation
                                  Joan M. Mills, Vice President    Mortgage Pass-Through Certificates, Series
                                                                     without recourse.   2006-F

MULTISTATE INITIAL INTEREST ADJUSTABLE RATE NOTE - 1-Year LIBOR Index (Assumable after Initial Period) - Single Family -
Freddie Mac UNIFORM INSTRUMENT
DOCPREP SERVICES, INC. FORM - MS5537N-SRM        Page 5 of 5         Form 5537  5/04 (rev. 7/05)
LOAN NO.: [redacted]                             ORIGINAL      MIN NO.: [redacted]

Exhibit . C

(12) **United States Patent**
Peterson et al.

(10) **Patent No.:** US 9,230,130 B2
(45) **Date of Patent:** Jan. 5, 2016

(54) **SYSTEM AND METHOD FOR RULES-BASED CONTROL OF CUSTODY OF ELECTRONIC SIGNATURE TRANSACTIONS**

(71) Applicant: **DocuSign, Inc.**, Seattle, WA (US)

(72) Inventors: **Donald G. Peterson**, Kirkland, WA (US); **Doug Rybacki**, Seattle, WA (US); **Duane E. Wald**, Kent, WA (US)

(73) Assignee: **DocuSign, Inc.**, Seattle, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 254 days.

(21) Appl. No.: 13/838,233

(22) Filed: **Mar. 15, 2013**

(65) **Prior Publication Data**

US 2013/0263283 A1    Oct. 3, 2013

**Related U.S. Application Data**

(60) Provisional application No. 61/614,371, filed on Mar. 22, 2012.

(51) **Int. Cl.**
G06F 7/04        (2006.01)
G06F 17/30       (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... *G06F 21/6218* (2013.01); *G06F 21/645* (2013.01); *G11B 20/00862* (2013.01); *G06F 2221/2137* (2013.01); *H04L 2209/603* (2013.01); *H04L 2463/101* (2013.01)

(58) **Field of Classification Search**
CPC .................. G11B 20/0086; G11B 20/00847; G11B 20/00869; G11B 20/00731; G11B 20/00427; G06F 21/10; H04N 21/4627; H04L 2463/101; H04L 2209/60; H04L 2209/603; G06Q 30/06; G06Q 30/1235
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,040,142 A    8/1991  Mori et al.
5,220,675 A    6/1993  Padawer et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN    101299256    11/2008
EP    1238321      6/2001
(Continued)

OTHER PUBLICATIONS

Wheeler et al., "DocuSign Unveils new Scalable Product and Support Offerings of Electronic Signature and Electronic Contract Execution," DocuSign The Fastest Way to Get a Signature, 2 pp., Jan. 2008.
(Continued)

*Primary Examiner* — Ashok Patel
*Assistant Examiner* — Daniel Potratz
(74) *Attorney, Agent, or Firm* — Schwegman Lundberg & Woessner, P.A.

(57)        **ABSTRACT**

Techniques for electronic signature processes are described. Some embodiments provide an electronic signature service ("ESS") configured to facilitate the creation, storage, and management of electronic signature documents. In one embodiment, an electronic signature document may be associated with custody transfer rules that facilitate transfers of custody of an electronic signature document from one user or party to another. A custody transfer may results in a transfer of rights or capabilities to operate upon (e.g., modify, view, send, delete) an electronic signature document and/or its associated data. A custody transfer rule may be trigged by the occurrence of a particular event, such as the receipt of an electronic signature.

**19 Claims, 3 Drawing Sheets**



Exhibit D

## US 9,230,130 B2

Page 2

| (51) | Int. Cl. | |
| --- | --- | --- |
| | *H04N 7/16* | (2011.01) |
| | *G06F 21/62* | (2013.01) |
| | *G11B 20/00* | (2006.01) |
| | *G06F 21/64* | (2013.01) |

**(56)** References Cited

U.S. PATENT DOCUMENTS

| 5,222,138 | A | 6/1993 | Balabon et al. |
| --- | --- | --- | --- |
| 5,337,360 | A | 8/1994 | Fischer |
| 5,390,247 | A | 2/1995 | Fischer |
| 5,465,299 | A | 11/1995 | Matsumoto et al. |
| 5,544,255 | A | 8/1996 | Smithies et al. |
| 5,553,145 | A | 9/1996 | Micali |
| 5,615,268 | A | 3/1997 | Bisbee et al. |
| 5,629,982 | A | 5/1997 | Micali |
| 5,689,567 | A | 11/1997 | Miyauchi |
| 5,748,738 | A | 5/1998 | Bisbee et al. |
| 5,813,009 | A | 9/1998 | Johnson et al. |
| 5,832,499 | A | 11/1998 | Gustman |
| 5,872,848 | A | 2/1999 | Romney et al. |
| 5,898,156 | A | 4/1999 | Wilfong |
| 6,021,202 | A | 2/2000 | Anderson et al. |
| 6,067,531 | A | 5/2000 | Hoyt et al. |
| 6,085,322 | A | 7/2000 | Romney et al. |
| 6,092,080 | A | 7/2000 | Gustman |
| 6,119,229 | A | 9/2000 | Martinez et al. |
| 6,128,740 | A | 10/2000 | Curry et al. |
| 6,161,139 | A | 12/2000 | Win et al. |
| 6,185,587 | B1 | 2/2001 | Bernardo et al. |
| 6,185,683 | B1 | 2/2001 | Ginter et al. |
| 6,199,052 | B1 | 3/2001 | Mitty et al. |
| 6,210,276 | B1 | 4/2001 | Mullins |
| 6,237,096 | B1 | 5/2001 | Bisbee et al. |
| 6,289,460 | B1 | 9/2001 | Hajmiragha |
| 6,321,333 | B1 | 11/2001 | Murray |
| 6,327,656 | B2 | 12/2001 | Zabetian |
| 6,367,010 | B1 | 4/2002 | Venkatram et al. |
| 6,367,013 | B1 | 4/2002 | Bisbee et al. |
| 6,446,115 | B2 | 9/2002 | Powers |
| 6,470,448 | B1 | 10/2002 | Kuroda et al. |
| 6,584,466 | B1 | 6/2003 | Serbinis et al. |
| 6,615,348 | B1 | 9/2003 | Gibbs |
| 6,658,403 | B1 | 12/2003 | Kuroda et al. |
| 6,671,805 | B1 | 12/2003 | Brown et al. |
| 6,728,762 | B1 | 4/2004 | Estrada et al. |
| 6,751,632 | B1 | 6/2004 | Petrogiannis |
| 6,754,829 | B1 | 6/2004 | Butt et al. |
| 6,796,489 | B2 | 9/2004 | Slater et al. |
| 6,807,633 | B1 | 10/2004 | Pavlik |
| 6,829,635 | B1 | 12/2004 | Townshend |
| 6,912,660 | B1 | 6/2005 | Petrogiannis |
| 6,931,420 | B1 | 8/2005 | Silvester et al. |
| 6,938,157 | B2 | 8/2005 | Kaplan |
| 6,944,648 | B2 | 9/2005 | Cochran et al. |
| 6,947,911 | B1 | 9/2005 | Moritsu et al. |
| 6,959,382 | B1 | 10/2005 | Kinnis et al. |
| 6,961,854 | B2 | 11/2005 | Serret-Avila et al. |
| 6,973,569 | B1 | 12/2005 | Anderson et al. |
| 6,990,684 | B2 | 1/2006 | Futamura et al. |
| 7,039,805 | B1 | 5/2006 | Messing |
| 7,059,516 | B2 | 6/2006 | Matsuyama et al. |
| 7,069,443 | B2 | 6/2006 | Berringer et al. |
| 7,093,130 | B1 | 8/2006 | Kobayashi et al. |
| 7,100,048 | B1 | 8/2006 | Yamada et al. |
| 7,103,778 | B2 | 9/2006 | Kon et al. |
| 7,130,829 | B2 * | 10/2006 | Banerjee et al. .............. 705/51 |
| 7,162,635 | B2 | 1/2007 | Bisbee et al. |
| 7,167,844 | B1 | 1/2007 | Leong et al. |
| 7,197,644 | B2 | 3/2007 | Brewington |
| 7,237,114 | B1 | 6/2007 | Rosenberg |
| 7,340,608 | B2 * | 3/2008 | Laurie et al. .............. 713/176 |
| 7,360,079 | B2 | 4/2008 | Wall |
| 7,395,436 | B1 | 7/2008 | Nemovicher |
| 7,424,543 | B2 | 9/2008 | Rice, III |
| 7,437,421 | B2 | 10/2008 | Bhogal et al. |

| 7,523,315 | B2 | 4/2009 | Hougaard et al. |
| --- | --- | --- | --- |
| 7,533,268 | B1 | 5/2009 | Catorcini et al. |
| 7,554,576 | B2 | 6/2009 | Erol et al. |
| 7,562,053 | B2 | 7/2009 | Twining et al. |
| 7,568,101 | B1 | 7/2009 | Catorcini et al. |
| 7,568,104 | B2 | 7/2009 | Berryman et al. |
| 7,581,105 | B2 | 8/2009 | Dietl |
| 7,657,832 | B1 | 2/2010 | Lin |
| 7,660,863 | B2 | 2/2010 | Boursetty et al. |
| 7,660,981 | B1 * | 2/2010 | Hunt .............. 713/156 |
| 7,788,259 | B2 | 8/2010 | Patterson et al. |
| 7,934,098 | B1 | 4/2011 | Hahn et al. |
| 7,953,977 | B2 | 5/2011 | Maruyama et al. |
| 8,103,867 | B2 | 1/2012 | Spitz |
| 8,132,013 | B2 | 3/2012 | Meier |
| 8,286,071 | B1 | 10/2012 | Zimmerman et al. |
| 8,588,483 | B2 | 11/2013 | Hicks et al. |
| 8,612,349 | B1 | 12/2013 | Ledder et al. |
| 8,627,500 | B2 * | 1/2014 | Rogel et al. .............. 726/28 |
| 8,924,302 | B2 * | 12/2014 | Bisbee et al. .............. 705/50 |
| 2001/0002485 | A1 * | 5/2001 | Bisbee et al. .............. 713/167 |
| 2001/0018739 | A1 | 8/2001 | Anderson et al. |
| 2001/0034739 | A1 | 10/2001 | Anecki et al. |
| 2001/0034835 | A1 | 10/2001 | Smith |
| 2002/0004800 | A1 | 1/2002 | Kikuta et al. |
| 2002/0019937 | A1 | 2/2002 | Edstrom et al. |
| 2002/0026427 | A1 | 2/2002 | Kon et al. |
| 2002/0026582 | A1 | 2/2002 | Futamura et al. |
| 2002/0040431 | A1 | 4/2002 | Kato et al. |
| 2002/0069179 | A1 | 6/2002 | Slater et al. |
| 2002/0069358 | A1 | 6/2002 | Silvester |
| 2002/0129056 | A1 | 9/2002 | Conant et al. |
| 2002/0138445 | A1 | 9/2002 | Laage et al. |
| 2002/0143711 | A1 | 10/2002 | Nassiri |
| 2002/0162000 | A1 | 10/2002 | Bensler |
| 2002/0178187 | A1 | 11/2002 | Rasmussen et al. |
| 2002/0184485 | A1 | 12/2002 | Dray et al. |
| 2002/0194219 | A1 | 12/2002 | Bradley et al. |
| 2002/0196478 | A1 | 12/2002 | Struble |
| 2003/0048301 | A1 | 3/2003 | Menninger |
| 2003/0051016 | A1 | 3/2003 | Miyoshi et al. |
| 2003/0078880 | A1 | 4/2003 | Alley et al. |
| 2003/0120553 | A1 | 6/2003 | Williams |
| 2003/0120930 | A1 | 6/2003 | Simpson et al. |
| 2003/0131073 | A1 | 7/2003 | Lucovsky et al. |
| 2003/0140252 | A1 | 7/2003 | Lafon et al. |
| 2003/0217264 | A1 | 11/2003 | Martin et al. |
| 2003/0217275 | A1 | 11/2003 | Bentley et al. |
| 2004/0054606 | A1 | 3/2004 | Broerman |
| 2004/0078337 | A1 | 4/2004 | King et al. |
| 2004/0107352 | A1 | 6/2004 | Yui et al. |
| 2004/0117627 | A1 | 6/2004 | Brewington |
| 2004/0133493 | A1 | 7/2004 | Ford et al. |
| 2004/0181756 | A1 | 9/2004 | Berringer et al. |
| 2004/0225884 | A1 | 11/2004 | Lorenzini et al. |
| 2004/0230891 | A1 | 11/2004 | Pravetz et al. |
| 2004/0250070 | A1 | 12/2004 | Wong |
| 2004/0255114 | A1 | 12/2004 | Lee et al. |
| 2004/0255127 | A1 | 12/2004 | Arnouse |
| 2005/0033811 | A1 | 2/2005 | Bhogal et al. |
| 2005/0049903 | A1 | 3/2005 | Raja |
| 2005/0071658 | A1 | 3/2005 | Nath et al. |
| 2005/0076215 | A1 | 4/2005 | Dryer |
| 2005/0091143 | A1 | 4/2005 | Schmidt et al. |
| 2005/0120217 | A1 | 6/2005 | Eifield et al. |
| 2005/0165626 | A1 | 7/2005 | Karpf |
| 2005/0182684 | A1 | 8/2005 | Dawson et al. |
| 2005/0182956 | A1 | 8/2005 | Ginter et al. |
| 2005/0192908 | A1 | 9/2005 | Jorimann et al. |
| 2005/0231738 | A1 | 10/2005 | Huff et al. |
| 2006/0047600 | A1 | 3/2006 | Bodenheim et al. |
| 2006/0161780 | A1 | 7/2006 | Berryman et al. |
| 2006/0161781 | A1 | 7/2006 | Rice et al. |
| 2006/0174199 | A1 | 8/2006 | Soltis et al. |
| 2006/0205476 | A1 | 9/2006 | Jubinville |
| 2006/0230282 | A1 | 10/2006 | Hausler |
| 2006/0259440 | A1 | 11/2006 | Leake et al. |
| 2006/0261545 | A1 | 11/2006 | Rogers |
| 2006/0294152 | A1 | 12/2006 | Kawabe et al. |



FILED: KINGS COUNTY CLERK 03/09/2017 09:46 AM INDEX NO. 506127/2016
NYSCEF DOC. NO. 27 RECEIVED NYSCEF: 03/09/2017
Case 1:20-cv-02343-RRM Document 5-2 Filed 07/22/20 Page 34 of 49 PageID #: 252

(56) **References Cited**

U.S. PATENT DOCUMENTS

2007/0026927 A1 2/2007 Yaldoo et al.
2007/0079139 A1 4/2007 Kim
2007/0088958 A1 4/2007 Qa'Im-maqami
2007/0100765 A1 5/2007 Naganuma
2007/0118732 A1 5/2007 Whitmore
2007/0130186 A1 6/2007 Ramsey et al.
2007/0136361 A1 6/2007 Lee et al.
2007/0143085 A1 6/2007 Kimmel
2007/0165865 A1 7/2007 Talvitie
2007/0198533 A1 8/2007 Foygel et al.
2007/0208944 A1 9/2007 Pavlicic
2007/0220260 A1 9/2007 King
2007/0271592 A1 11/2007 Noda et al.
2007/0289022 A1 12/2007 Wittkotter
2008/0016357 A1 1/2008 Suarez
2008/0034213 A1 2/2008 Boemker et al.
2008/0097777 A1 4/2008 Rielo
2008/0141033 A1 6/2008 Ginter et al.
2008/0209313 A1 8/2008 Gonser
2008/0209516 A1 8/2008 Nassiri
2008/0216147 A1 9/2008 Duffy
2008/0235577 A1 9/2008 Veluchamy et al.
2008/0260287 A1 10/2008 Berryman et al.
2008/0313723 A1 12/2008 Naono et al.
2009/0024912 A1 1/2009 McCabe et al.
2009/0025087 A1 1/2009 Peirson, Jr. et al.
2009/0044019 A1 2/2009 Lee et al.
2009/0099881 A1 4/2009 Hanna et al.
2009/0132351 A1 5/2009 Gibson
2009/0138730 A1 5/2009 Cook et al.
2009/0145958 A1 6/2009 Stoutenburg et al.
2009/0164488 A1 6/2009 Katsurabayashi
2009/0185241 A1 7/2009 Nepomniachtchi
2009/0268903 A1 10/2009 Bojinov et al.
2009/0292786 A1 11/2009 Mccabe et al.
2010/0088364 A1 4/2010 Carter et al.
2010/0122094 A1 5/2010 Shima
2010/0153011 A1 6/2010 Obrea et al.
2010/0217987 A1 8/2010 Shevade
2010/0235727 A1 9/2010 Ashton et al.
2010/0242085 A1 9/2010 Dutta et al.
2010/0274863 A1 10/2010 Foygel et al.
2010/0287260 A1 11/2010 Peterson et al.
2010/0293094 A1 11/2010 Kolkowitz et al.
2011/0093769 A1 4/2011 Dunn et al.
2011/0119165 A1 5/2011 Zee
2011/0126022 A1 5/2011 Sieberer
2011/0153560 A1* 6/2011 Bryant et al. ................ 707/610
2011/0238510 A1 9/2011 Rowen et al.
2011/0264907 A1 10/2011 Betz et al.
2011/0314371 A1 12/2011 Peterson et al.
2012/0072837 A1* 3/2012 Triola ......................... 715/268
2012/0180135 A1 7/2012 Hodges et al.
2012/0209970 A1 8/2012 Scipioni et al.
2012/0271882 A1 10/2012 Sachdeva et al.
2012/0304265 A1 11/2012 Richter et al.
2013/0019156 A1 1/2013 Gonser et al.
2013/0019289 A1 1/2013 Gonser et al.
2013/0050512 A1 2/2013 Gonser et al.
2013/0060661 A1* 3/2013 Block et al. ............... 705/26.44
2013/0067243 A1 3/2013 Tamayo-Rios et al.
2013/0159720 A1 6/2013 Gonser et al.
2013/0179676 A1 7/2013 Hamid
2013/0254111 A1 9/2013 Gonser et al.
2013/0263283 A1 10/2013 Peterson et al.
2014/0019761 A1 1/2014 Shapiro

FOREIGN PATENT DOCUMENTS

JP 2000048072 2/2000
JP 2003271529 9/2003
JP 2005267438 9/2005
JP 2008117258 5/2008
JP 2008225527 9/2008
KR 20000049674 8/2000
KR 1020020092595 12/2002
KR 1020070059931 6/2007
KR 100929488 12/2009
KR 20090122657 12/2009
RU 2400811 11/2005
RU 2291491 10/2007
RU 2300844 6/2010
WO 9607156 3/1996
WO 03091834 11/2003
WO 2007075235 7/2007
WO 2008124627 10/2008
WO 2009012478 1/2009
WO 2010105262 9/2010

OTHER PUBLICATIONS

Borozdin et al., "DocuSign Connect Service Guide," DocuSign, Inc., pp. 1-9, 2008.
eLynx Adds Workflow Management to Electronic Document Platform—new Workflow Capabilities Provide for Enhanced Electronic Loan Processing, eLynx, http://www.elynx.com/news/view/82, 2 pp. Jan. 2009.
Laurens Leurs; The history of PDF; Feb. 14, 2010; Prepressure.com; pp. 1-12.
Brown, "Digital Signatures: Can They Be Accepted As Legal Signatures in EID?", Dec. 1993, ACM, p. 86-92.
Herzberg et al., "Surf'N'Sign: Client Signatures on Web Documents", 1998, IEEE, vol. 37 Issue 1, p. 61-71.
Kwok et al., "An Automatic Electronic Contract Document Signing System in a Secure Environment", 2005, IEEE, p. 497-502.
Su et al., "Signature-In-Signature Verification Via a Secure Simple Network Protocol", 2010, IEEE, p. 1-4.
Zefferer et al., "An Electronic-Signature Based Circular Resolution Database System," Mar 2010, ACM, p. 1840-1845.
Kamara et al., "Cryptographic Cloud Storage", 2010, Financial Cryptography and Data Security, p. 136-149.
Harold, Elliotte Rusty, XML Bible, IDG Books Worldwide, Inc., 1999, p. 191-192.
"European Application Serial No. 13764546.1, Extended European Search Report mailed Oct. 30, 2015", 6 pgs.
Du, Timon C, et al., "Document access control in organisational workflows", International Journal Of Information And Computer Security, vol. 1, No. 4, (2007), 437-454.

* cited by examiner

*Fig. 1*

FILED: KINGS COUNTY CLERK 03/09/2017 09:46 AM
INDEX NO. 506127/2016
NYSCEF DOC. NO. 27
RECEIVED NYSCEF: 03/09/2017

Case 1:20-cv-02343-RRM Document 5-2 Filed 07/22/20 Page 36 of 49 PageID #: 254

200



Rules Manager Process

Associate a custody transfer rule with an electronic signature document  — 202

In response to occurrence of an event, transfer custody of the document based on the custody transfer rule  — 204

Store information about the transfer of custody of the electronic signature document  — 206

Return

*Fig. 2*

FILED: KINGS COUNTY CLERK 03/09/2017 09:46 AM
NYSCEF DOC. NO. 27
INDEX NO. 506127/2016
RECEIVED NYSCEF: 03/09/2017
Case 1:20-cv-02343-RRM   Document 5-2   Filed 07/22/20   Page 37 of 49 PageID #: 255



*Fig. 3*

US 9,230,130 B2

1

# SYSTEM AND METHOD FOR RULES-BASED CONTROL OF CUSTODY OF ELECTRONIC SIGNATURE TRANSACTIONS

## PRIORITY CLAIM

This application claims the benefit of U.S. Provisional Application No. 61/614,371, filed Mar. 22, 2012.

## FIELD OF THE INVENTION

The present disclosure relates to systems and methods for electronic signatures and, more particularly, to systems and methods for rules-based control of custody of electronic signature documents.

## BRIEF DESCRIPTION OF THE DRAWINGS

Preferred and alternative examples of the present invention are described in detail below with reference to the following drawings:

FIG. 1 illustrates an example block diagram of an example embodiment of an electronic signature service;

FIG. 2 is a flow diagram of an example rules manager process according to an example embodiment; and

FIG. 3 is a block diagram of an example computing system for implementing an electronic signature service according to an example embodiment.

## DETAILED DESCRIPTION

Embodiments described herein provide enhanced computer- and network-based methods and systems for facilitating electronic signatures. Example embodiments provide an electronic signature service ("ESS") configured to facilitate the creation, storage, and management of documents and corresponding electronic signatures. Using the ESS, a first user (a "sender") can provide or upload a document to be signed ("a signature document"), while a second user (a "signer") can access, review, and sign the uploaded document.

Some embodiments of the ESS facilitate rules-based control of custody of electronic signature documents. In one embodiment, an electronic signature document includes or is associated with custody transfer rules (or simply, "custody rules") that govern, control, or facilitate transfers of custody of an electronic signature document from one user or party to another. A custody transfer typically results in a transfer of rights or capabilities to operate upon (e.g., modify, view, send, delete) an electronic signature document and/or its associated data (e.g., history, form data, signature data). In some embodiments, when an electronic signature document changes custody, a first party associated with the document (e.g., that created, edited, or sent the document) loses one or more previously held rights to the document while a second party gains those and possibly other rights. For example, upon custody transfer, a current user (e.g., the initial document sender) may lose the right to edit or delete the document, while a second user (e.g., a manager) may gain the rights to view, edit, and delete the document. The first user may in some embodiments or configurations retain some rights, such as "read only" access allowing the first user to view the document.

Custody transfer rules may also specify conditions under which transfers of custody are to take place. For example, a sales organization may have two distinct types of users: sales representatives and sales managers. A sales representative may create an electronic signature document (or clone or copy an existing one) that represents a sales contract with a customer. Such an electronic signature document may be associated with custody transfer rules that cause custody of the document to transfer from the sales representative to the sales manager upon the occurrence of one or more events, such as when a customer completes an electronic signature, thereby closing a sale or otherwise completing a transaction. Other conditions may be specified, such as when the sales representative initially sends the electronic signature document to the customer, when a customer indicates refusal to sign the electronic signature document, when a specified amount or period of time passes, or the like.

FIG. 1 illustrates an example block diagram of an example embodiment of an electronic signature service. In particular, FIG. 1 depicts an ESS 110 utilized by a sender user 10 and a signer user 11 to perform an electronic signing of a signature document 20. FIG. 1 also depicts a transferee 12 who receives custody of the signature document 20.

In the illustrated scenario, the sender 10 operates a sender client device 160 in order to provide (e.g., upload, transmit) an electronic document 20 (e.g., an invoice, contract, or agreement) to the ESS 110, where it is securely stored. The electronic document includes or is associated with custody rules 21 that are configured to cause custody of the document 20 to transfer from the sender 10 to the transferee 12, possibly upon the occurrence of one or more conditions. In some embodiments or configurations, the sender 10 and transferee 12 may be in or work for the same organization. For example, the sender 10 may be a sales representative while the transferee 12 may be a sales manager or an in-house attorney who reviews and records sales contracts. In other situations, the sender 10 and transferee 12 may work for distinct organizations or entities.

The sender 10 and/or some other user (e.g., an administrator) may configure the document 20 and/or the custody rules 21. For example, an administrator may interact with a user interface configured to facilitate the specification of custody rules and associated conditions. The custody rules 21 are then stored by the ESS 110 in association with the document 20. In this example, the custody rules 21 are configured to cause custody of the document 20 to transfer to the transferee upon signature by the signer 11. At this time, the sender 10 may further modify, configure, or customize the document 20, such as by changing price and quantity terms, party names, dates, and the like.

After the sender 10 configures the document 20 to his satisfaction, the signer 11 may access the document 20. In one embodiment, the sender 10 notifies the signer 11, such as by causing the ESS 110 to send to the signer 11 a message (e.g., an email) that includes a reference (e.g., a URL) to the document 20 stored by the ESS 110. As another example, the sender 10 may directly include the document 20 in an email or other message transmitted to the signer 11. As a further example, the document 20 may be automatically presented to the signer 11 as part of a transaction. For example, an e-commerce system may cause the document 20 to be presented or transmitted to the signer 11 during or as part of a transaction for a good/service purchased via the e-commerce system.

Typically, the signer 11 operates a Web browser or other client module executing on the signer client device 161 to access and review the document 20 via the ESS 110. For example, if the signer 11 receives an email that includes a link to the document 20, the signer can click the link to visit the ESS 110 in order review and sign the document 20. If instead the signer 11 receives the document 20 itself directly from the sender 10, opening the document will also cause the user to visit the ESS 110 to provide the required signature informa-

US 9,230,130 B2

3

tion. When the document 20 and related data have been reviewed (and possibly modified) to the satisfaction of the signer 11, the signer attaches (or provides an indication or instruction to attach) his electronic signature to the document 20.

Once the signing has been completed, the ESS 110 causes custody of the document 20 to change from the sender 10 to the transferee 12. At this time, the sender 10 may lose one or more rights, such as the right to view, modify, or delete the document 20. In addition, the transferee 12 may gain one or more rights, such as the right to view, modify, or delete the document 20. The transferee 12 can access and perform various operations (e.g., view, modify, delete) via the transferee client device 162. Custody transfer rules may specify custody chains or sequences of arbitrary length (e.g., more than the two parties shown in this example). For example, custody of a document may transfer from a sales representative to a sales manager and thence to an in-house attorney.

In some embodiments, the document 20 may be associated with an envelope or other data structure that functions as a container that includes the document 20 (or a reference thereto) along with meta-information, including signature information, sender information (e.g., names, addresses), recipient/signer information (e.g., email addresses, names), and the like. Custody rules may be configured to manage access to an envelope and its related information. For example, one custody rule may specify that once the sender 10 has transferred control to the transferee 12, the sender 10 may view but not modify envelope information including the document 20. In other embodiments, the transferee 11, in turn, may receive additional rights, such as to delete the document 20, view information added to a form associated with the document 20, clone the document 20, or the like. In some embodiments, a user may upload a file that contains information about multiple documents for which custody is to be transferred, so as to effect a bulk transfer from one party to another.

FIG. 2 is a flow diagram of an example custody rules manager process 200 according to an example embodiment. The process of FIG. 2 may be performed by the ESS 110.

The illustrated process begins at block 202, where it associates a custody transfer rule with an electronic signature document. Associating a custody rule may include storing data structure or record that relates the custody rule with the document. The custody rule itself may be a data structure or record that includes indications of the document, users impacted by the custody rule, conditions or events that trigger custody transfers, access rights impacted by the rule, or the like.

At block 204, the process, in response to occurrence of an event, transfers custody of the document based on the custody transfer rule. Transferring custody may include removing one or more access rights from the first user, and in turn, granting those access rights to a second user. Different kinds of events may trigger the transfer operation, including the presentation (e.g., viewing), receipt, signature, or other operation upon or with respect to a signature document. Some events may be time based, so that custody transfers are triggered upon a passage of time or on a specified calendar day.

At block 206, the process stores information about the transfer of custody of the electronic signature document. Storing information about custody transfer may include updating a data structure or record to reflect a new document owner, to remove rights from one user, to grant rights to another user, or the like. After block 206, the process ends.

The process may perform additional or different operations. In some embodiments, the process may also enforce access rules governed by the custody rule. For example, when

4

the process receives an indication that a user is attempting to perform some operation (e.g., view, edit, delete) with respect to the signature document or its meta-data, the process may allow or disallow the operation based on a determination whether the user has the appropriate access rights to perform the indicated operation.

FIG. 3 is a block diagram of an example computing system for implementing an electronic signature service according to an example embodiment. In particular, FIG. 3 shows a computing system 100 that may be utilized to implement an ESS 110.

Note that one or more general purpose or special purpose computing systems/devices may be used to implement the ESS 110. In addition, the computing system 100 may comprise one or more distinct computing systems/devices and may span distributed locations. Furthermore, each block shown may represent one or more such blocks as appropriate to a specific embodiment or may be combined with other blocks. Also, the ESS 110 may be implemented in software, hardware, firmware, or in some combination to achieve the capabilities described herein.

In the embodiment shown, computing system 100 comprises a computer memory ("memory") 101, a display 102, one or more Central Processing Units ("CPU") 103, Input/Output devices 104 (e.g., keyboard, mouse, CRT or LCD display, and the like), other computer-readable media 105, and network connections 106 connected to a network 150. The ESS 110 is shown residing in memory 101. In other embodiments, some portion of the contents, some or all of the components of the ESS 110 may be stored on and/or transmitted over the other computer-readable media 105. The components of the ESS 110 preferably execute on one or more CPUs 103 and manage electronic signature processes including custody transfers as described herein. Other code or programs 130 (e.g., an administrative interface, a Web server, and the like) and potentially other data repositories, such as data repository 120, also reside in the memory 101, and preferably execute on one or more CPUs 103. Of note, one or more of the components in FIG. 3 may not be present in any specific implementation. For example, some embodiments may not provide other computer readable media 105 or a display 102.

The ESS 110 includes a service manager 111, a user interface ("UI") manager 112, an electronic signature service application program interface ("API") 113, a rules manager 114, and an electronic signature service data store 115.

The ESS 110, via the service manager 111 and related logic, generally performs electronic signature-related functions for or on behalf of users operating a sender client device 160, a signer client device 161, and a transferee client device 162. In one embodiment, a sender operating the sender client device 160 provides (e.g., transmits, uploads, sends) a document to be electronically signed to the ESS 110. The ESS 110 stores the document securely in data store 115. Secure document storage may include using cryptographic techniques to detect document tampering, such as generating hashes, message digests, or the like. In some embodiments, the document is stored as part of (or in association with) an "envelope" that is used to track and record information about the document as it progresses through its lifecycle of creation, transfer, signature, completion, and the like.

A signer operating the signer client device 161 then accesses, reviews, and signs the document stored by the ESS 110. In some embodiments, the ESS 110 transmits images or some other representation of the document to the signer client device 161, which in turn transmits signature data including an indication of the signer's signature (or intent to sign) to the

FILED: KINGS COUNTY CLERK 03/09/2017 09:46 AM
NYSCEF DOC. NO. 1
INDEX NO. 506127/2016
RECEIVED NYSCEF: 03/09/2017

US 9,230,130 B2

ESS 110. The ESS 110 then securely stores the provided signature data in association with the document in the data store 115.

The rules manager 114 facilitates custody transfers of electronic signature documents as discussed herein. Initially, a sender or other user operating the sender client device 160 may associate custody transfer rules with an electronic signature document stored in the data store 115. The rules manager 114 tracks and executes the specified rules as appropriate. For example, if a rule indicates custody transfer upon document signature, the rules manager 114 monitors the document and, in response to a received signature, modifies (or causes to be modified) data structures or other records that specify or control access rights or operations associated with the document. In particular, access rights may be removed or disassociated from a first user. In addition or instead, the same or different access rights may be granted or otherwise associated with a second user. In some embodiments, custody transfers may occur between groups of users.

A custody transfer rule may be represented as a data structure, record in a database, or similar. The custody transfer rule may include indications of users that are impacted by the rule, events that trigger the rule, and access rights (e.g., view, modify, delete) that are shifted based on the rule and one or more events.

The UI manager 112 provides a view and a controller that facilitate user interaction with the ESS 110 and its various components. For example, the UI manager 112 may provide interactive access to the ESS 110, such that users can upload or download documents for signature, create and/or configure custody rules associated with or incorporated into signature documents, and the like. In some embodiments, access to the functionality of the UI manager 112 may be provided via a Web server, possibly executing as one of the other programs 130. In such embodiments, a user operating a Web browser (or other client) executing on one of the client devices 160-162 can interact with the ESS 110 via the UI manager 112.

The API 113 provides programmatic access to one or more functions of the ESS 110. For example, the API 113 may provide a programmatic interface to one or more functions of the ESS 110 that may be invoked by one of the other programs 130 or some other module. In this manner, the API 113 facilitates the development of third-party software, such as user interfaces, plug-ins, news feeds, adapters (e.g., for integrating functions of the ESS 110 into Web applications), and the like. In addition, the API 113 may be in at least some embodiments invoked or otherwise accessed via remote entities, such as a third-party system (not shown), to access various functions of the ESS 110. For example, a customer relationship management system may push or otherwise import customer data and/or agreements into the ESS via the API 113.

The data store 115 is used by the other modules of the ESS 110 to store and/or communicate information. The components of the ESS 110 use the data store 115 to record various types of information, including documents, signatures, custody rules, and the like. Although the components of the ESS 110 are described as communicating primarily through the data store 115, other communication mechanisms are contemplated, including message passing, function calls, pipes, sockets, shared memory, and the like.

The ESS 110 interacts via the network 150 with client devices 160-162. The network 150 may be any combination of one or more media (e.g., twisted pair, coaxial, fiber optic, radio frequency), hardware (e.g., routers, switches, repeaters, transceivers), and one or more protocols (e.g., TCP/IP, UDP, Ethernet, Wi-Fi, WiMAX) that facilitate communication

between remotely situated humans and/or devices. In some embodiments, the network 150 may be or include multiple distinct communication channels or mechanisms (e.g., cable-based and wireless). The client devices 160-162 include personal computers, laptop computers, smart phones, personal digital assistants, tablet computers, and the like.

In an example embodiment, components/modules of the ESS 110 are implemented using standard programming techniques. For example, the ESS 110 may be implemented as a "native" executable running on the CPU 103, along with one or more static or dynamic libraries. In other embodiments, the ESS 110 may be implemented as instructions processed by a virtual machine that executes as one of the other programs 130. In general, a range of programming languages known in the art may be employed for implementing such example embodiments, including representative implementations of various programming language paradigms, including but not limited to, object-oriented (e.g., Java, C++, C#, Visual Basic-.NET, Smalltalk, and the like), functional (e.g., ML, Lisp, Scheme, and the like), procedural (e.g., C, Pascal, Ada, Modula, and the like), scripting (e.g., Perl, Ruby, Python, JavaScript, VBScript, and the like), and declarative (e.g., SQL, Prolog, and the like).

The embodiments described above may also use either well-known or proprietary synchronous or asynchronous client-server computing techniques. Also, the various components may be implemented using more monolithic programming techniques, for example, as an executable running on a single CPU computer system, or alternatively decomposed using a variety of structuring techniques known in the art, including but not limited to, multiprogramming, multithreading, client-server, or peer-to-peer, running on one or more computer systems each having one or more CPUs. Some embodiments may execute concurrently and asynchronously, and communicate using message passing techniques. Equivalent synchronous embodiments are also supported. Also, other functions could be implemented and/or performed by each component/module, and in different orders, and by different components/modules, yet still achieve the described functions.

In addition, programming interfaces to the data stored as part of the ESS 110, such as in the data store 118, can be available by standard mechanisms such as through C, C++, C#, and Java APIs; libraries for accessing files, databases, or other data repositories; through scripting languages such as XML; or through Web servers, FTP servers, or other types of servers providing access to stored data. The data store 118 may be implemented as one or more database systems, file systems, or any other technique for storing such information, or any combination of the above, including implementations using distributed computing techniques.

Different configurations and locations of programs and data are contemplated for use with techniques described herein. A variety of distributed computing techniques are appropriate for implementing the components of the illustrated embodiments in a distributed manner including but not limited to TCP/IP sockets, RPC, RMI, HTTP, Web Services (XML-RPC, JAX-RPC, SOAP, and the like). Other variations are possible. Also, other functionality could be provided by each component/module, or existing functionality could be distributed amongst the components/modules in different ways, yet still achieve the functions described herein.

Furthermore, in some embodiments, some or all of the components of the ESS 110 may be implemented or provided in other manners, such as at least partially in firmware and/or hardware, including, but not limited to one or more application-specific integrated circuits ("ASICs"), standard inte-

FILED: KINGS COUNTY CLERK 03/09/2017 09:46 AM
INDEX NO. 506127/2016

NYSCEF DOC. NO. 27
Case 1:20-cv-02343-RRM  Document 5-2  Filed 07/22/20  Page 41 of 49 PageID #: 259
RECEIVED NYSCEF: 03/09/2017

US 9,230,130 B2

7

grated circuits, controllers executing appropriate instructions, and including microcontrollers and/or embedded controllers, field-programmable gate arrays ("FPGAs"), complex programmable logic devices ("CPLDs"), and the like. Some or all of the system components and/or data structures may also be stored as contents (e.g., as executable or other machine-readable software instructions or structured data) on a computer-readable medium (e.g., as a hard disk; a memory; a computer network or cellular wireless network or other data transmission medium; or a portable media article to be read by an appropriate drive or via an appropriate connection, such as a DVD or flash memory device) so as to enable or configure the computer-readable medium and/or one or more associated computing systems or devices to execute or otherwise use or provide the contents to perform at least some of the described techniques. Some or all of the system components and data structures may also be stored as data signals (e.g., by being encoded as part of a carrier wave or included as part of an analog or digital propagated signal) on a variety of computer-readable transmission mediums, which are then transmitted, including across wireless-based and wired/cable-based mediums, and may take a variety of forms (e.g., as part of a single or multiplexed analog signal, or as multiple discrete digital packets or frames). Such computer program products may also take other forms in other embodiments. Accordingly, embodiments of this disclosure may be practiced with other computer system configurations.

It should be apparent to those skilled in the art that many more modifications besides those already described are possible without departing from the inventive concepts herein. Moreover, in interpreting both the specification and the claims, all terms should be interpreted in the broadest possible manner consistent with the context. In particular, the terms "includes," "including," "comprises," and "comprising" should be interpreted as referring to elements, components, or steps in a non-exclusive manner, indicating that the referenced elements, components, or steps may be present, or utilized, or combined with other elements, components, or steps that are not expressly referenced. Where the specification claims refers to at least one of something selected from the group consisting of A, B, C . . . and N, the text should be interpreted as requiring one or more elements from the set {A, B, C, . . . N}, and not N in addition to one or more elements from the set {A, B, C}.

All of the above-cited references, including U.S. Provisional Application No. 61/614,371, filed Mar. 22, 2012, entitled "SYSTEM AND METHOD FOR RULES-BASED CONTROL OF CUSTODY OF ELECTRONIC SIGNATURE TRANSACTIONS" are incorporated herein by reference in their entireties. Where a definition or use of a term in an incorporated reference is inconsistent with or contrary to the definition or use of that term provided herein, the definition or use of that term provided herein governs.

While the preferred embodiment of the invention has been illustrated and described, as noted above, many changes can be made without departing from the spirit and scope of the invention. Accordingly, the scope of the invention is not limited by the disclosure of the preferred embodiment.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

1. A method executed by an electronic signature service (ESS) computing device, the method comprising:

receiving an electronic signature document and associating a custody transfer rule with the electronic signature document from a client device associated with a first

8

user, the custody transfer rule comprising a data structure used by the ESS computing device and further comprising:

data identifying users in a custody chain for the electronic signature document; and

data identifying an event to transition custody of the electronic signature document from a first user of the custody chain to a second user of the custody chain, the custody of the electronic signature document comprising an access right with respect to the electronic signature document, and the event comprising a response to an electronic signature request;

transmitting the electronic signature request to a client device associated with a third user not included in the custody chain;

in response to detecting the event, transferring custody of the electronic signature document from the first user to the second user according to the custody transfer rule; and

storing data indicating the transfer of custody of the electronic signature document to prevent the client device associated with the first user from accessing the electronic signature document according to the access right with respect to the electronic signature document, and to allow access to the electronic signature document according to the access right with respect to the electronic signature document to a client device associated with the second user.

2. The method of claim 1, wherein the response to the electronic signature request comprises one of:

a receipt of signature of the electronic signature document by the third user; or

a refusal of signature of the electronic signature document by the third user.

3. The method of claim 2, wherein the response to the electronic signature request comprises the receipt of signature of the electronic signature document by the third user, and the method further comprises:

storing a second data structure comprising information corresponding to the signature of the electronic signature document, including information identifying the third user, date information, history information, and form data entered by the third user.

4. The method of claim 3, wherein after transferring custody of the electronic signature document from the first user to the second user, the first user retains a second access right to view the electronic signature document and to view the second data structure comprising information corresponding to the signature of the electronic signature document.

5. The method of claim 3, wherein the access right comprises access to view the electronic signature document and to view the second data structure comprising information corresponding to the signature of the electronic signature document.

6. The method of claim 1, wherein the access right comprises a right to modify the contents of electronic signature document.

7. The method of claim 1, wherein the access right comprises a right to delete the electronic signature document from the ESS computing device.

8. A computer-readable non-transitory medium comprising instructions that, when executed by a computing system, facilitate custody transfers of electronic signature documents, by performing a method comprising:

receiving an electronic signature document and associating a custody transfer rule with the electronic signature document from a client device associated with a first

US 9,230,130 B2

9

user, the custody transfer rule comprising a data structure used by an electronic signature service (ESS) and further comprising:
data identifying users in a custody chain for the electronic signature document; and
data identifying an event to transition custody of the electronic signature document from a first user of the custody chain to a second user of the custody chain, the custody of the electronic signature document comprising an access right with respect to the electronic signature document, and the event comprising a response to an electronic signature request;
transmitting the electronic signature request to a client device associated with a third user not included in the custody chain;
in response to detecting the event, transferring custody of the electronic signature document from the first user to the second user according to the custody transfer rule; and
storing data indicating the transfer of custody of the electronic signature document to prevent any client device associated with the first user from accessing the electronic signature document according to the access right with respect to the electronic signature document, and to allow access to the electronic signature document according to the access right with respect to the electronic signature document to a client device associated with the second user.

9. The computer-readable non-transitory medium of claim 8, wherein the method further comprises:
transmitting an email to the third user, the email including a link operable to access the electronic signature document at the electronic signature service, wherein the event comprises receiving an indication that the third user has activated the link to access the electronic signature document.

10. The computer-readable non-transitory medium of claim 8, wherein the response to the electronic signature request comprises one of:
a receipt of signature of the electronic signature document by the third user; or
a refusal of signature of the electronic signature document by the third user.

11. The computer readable non-transitory medium of claim 10, wherein the response to the electronic signature request comprises the receipt of signature of the electronic signature document by the third user, and the method further comprises:
storing a second data structure comprising information corresponding to the signature of the electronic signature document, including information identifying the third user, date information, history information, and form data entered by the third user.

12. The computer readable non-transitory medium of claim 11, wherein after transferring custody of the electronic signature document from the first user to the second user, the first user retains a second access right to view the electronic signature document and to view the second data structure comprising information corresponding to the signature of the electronic signature document.

13. The computer readable non-transitory medium of claim 11, wherein the access right comprises access to view the electronic signature document and to view the second data structure comprising information corresponding to the signature of the electronic signature document.

14. A computing system configured to facilitate custody transfers of electronic signature documents, comprising:
a hardware processor

10

to:
receive an electronic signature document and associate a custody transfer rule with the electronic signature document from a client device associated with a first user, the custody transfer rule comprising a data structure used by an electronic signature service (ESS) and further comprising:
data identifying users in a custody chain for the electronic signature document; and
data identifying an event to transition custody of the electronic signature document from a first user of the custody chain to a second user of the custody chain, the custody of the electronic signature document comprising an access right with respect to the electronic signature document, and the event comprising a response to an electronic signature request;
transmit the electronic signature request to a client device associated with a third user not included in the custody chain;
in response to detecting the event, transfer custody of the electronic signature document from the first user to the second user according to the custody transfer rule; and
store data indicating the transfer of custody of the electronic signature document to prevent the client device associated with the first user from accessing the electronic signature document according to the access right with respect to the electronic signature document, and to allow access to the electronic signature document according to the access right with respect to the electronic signature document to a client device associated with the second user.

15. The computing system of claim 14, wherein the custody transfer rule specifies, for each of multiple operations to access the electronic signature document according to the access right with respect to the electronic signature document, whether each of the first and second user can perform the operation before and after the occurrence of the event, wherein the access right includes at least one of viewing, modifying, or deleting information related to the electronic signature document.

16. The system of claim 14, wherein the response to the electronic signature request comprises one of:
a receipt of signature of the electronic signature document by the third user; or
a refusal of signature of the electronic signature document by the third user.

17. The system of claim 16, wherein the response to the electronic signature request comprises the receipt of signature of the electronic signature document by the third user, and the hardware processor is further configured to:
store a second data structure comprising information corresponding to the signature of the electronic signature document, including information identifying the third user, date information, history information, and form data entered by the third user.

18. The system of claim 17, wherein after the transfer of custody of the electronic signature document from the first user to the second user, the first user is to retain a second access right to view the electronic signature document and to view the second data structure comprising information corresponding to the signature of the electronic signature document.

19. The system of claim 17, wherein the access right comprises access to view the electronic signature document and to

FILED: KINGS COUNTY CLERK 03/09/2017 09:46 AM
NYSCEF DOC. NO. 27
INDEX NO. 506127/2016
RECEIVED NYSCEF: 03/09/2017

Case 1:20-cv-02343-RRM   Document 5-2   Filed 07/22/20   Page 43 of 49 PageID #: 261

**11**                                                                           **12**

view the second data structure comprising information cor-
responding to the signature of the electronic signature docu-
ment.

\*   \*   \*   \*   \*

Case 1:20-cv-02343-RRM   Document 5-2   Filed 07/22/20   Page 44 of 49 PageID #: 262

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

US Bank National Association, as Trustee for Mortgage Pass-
Through Certificates, Series 2006-F ,

                                    Plaintiff,

                    -against-

Michael Krichevsky, Capital Resources Corporation, National
City Bank, New York City Environmental Control Board, New
York City Parking Violations Bureau, New York City Transit
Adjudication Bureau,

                                    Defendants.

**AFFIDAVIT OF
MERIT AND
AMOUNTS DUE AND
OWING**

**Index No.: 25477/09**

Mortgaged Premises: 4221 Atlantic Avenue Brooklyn, NY 11224
Block and Lot information numbers: 7026 53

STATE OF North Carolina  )

COUNTY OF Mecklenburg ) SS.:

Anisha N. Sims, being duly sworn, deposes and says:

1.  I am Vice President Loan Documentation of Wells Fargo Bank, N.A., the servicer for the
    Plaintiff and as such am authorized to execute this affidavit and to make the
    representations contained herein.

2.  I have access to the business records relating to the loan at issue herein, which are
    maintained in the course of regularly conducted business activities. I make this affidavit
    based upon my review of the facts contained in those records.

3.  U.S. Bank National Association, as Trustee for Banc of America Funding Corporation
    Mortgage Pass-Through Certificates, Series 2006-F is in possession of the Promissory
    Note. The Promissory Note is duly indorsed to U.S. Bank National Association, as
    Trustee for Banc of America Funding Corporation Mortgage Pass-Through Certificates,
    Series 2006-F.

0G1-NY-V8

Exhibit E

4. There is in fact a default under the terms and conditions of the Promissory Note and Mortgage, because the May 1, 2009 and subsequent payments were not made.

5. The Plaintiff was not required to send the borrower a 90 day pre-foreclosure notice because in accordance with the statutory requirements in effect prior to January 14, 2010, the loan exceeded Fannie Mae's conforming loan amount.

6. Because the Plaintiff was not required to send a 90 day pre-foreclosure notice in this matter it did not make any filing regarding said notice with the superintendent of banks.

7. In accordance with the provisions of the Mortgage, a notice of default was mailed to the mortgagor(s) at the last known address provided to this institution by the mortgagor. The default stated in said notice was not cured. A copy of the notice of default is attached to this application.

8. Based on the default, Plaintiff elected to call due the entire unpaid principal balance together with interest and disbursements, including reasonable attorney fees and costs, allowable under the terms of the Promissory Note and Mortgage.

The total amount due the Plaintiff on said Note through July 19, 2013 is $932,147.45; which breaks down as follows:

| | | |
|---|---|---|
| Principal | | $746,256.13 |
| | | |
| Interest | | $144,337.93 |
| From | 04/01/2009 to 12/31/2010 @6.50%   $84,886.63 | |
| | 01/01/2011 to 12/31/2011 @3.00%   $22,387.68 | |
| | 01/01/2012 to 12/31/2012 @3.25%   $24,253.32 | |
| | 01/01/2013 to 07/19/2013 @3.125% $12,810.30 | |

| | |
|---|---|
| Pre-acceleration Late Charges | $323.36 |
| Hazard Insurance Disbursements | $22,073.34 |
| Tax Disbursements | $19,156.69 |
| Property Inspections/Preservation | $0.00 |
| PMI/MIP | $0.00 |
| Other (specify charges/fees) | $0.00 |

001-NY-V8

Escrow Balance Credit                                    $0.00
Credits to Borrower                                      $0.00

Total                                                    $932,147.45

Per diem interest in the amount of $63.89 will accrue on the principal from July 19, 2013 to the next interest rate change date and accrue thereafter in accordance with the variable rate as set forth in the Note.

## THIS SPACE INTENTIONALLY LEFT BLANK

BY ⫯.N.ᶘ

001-NY-V8

9. In accordance with the terms of the Promissory Note and Mortgage, Plaintiff may advance additional monies for the payment of taxes, insurance, and/or the maintenance of the premises in order to protect its security interest.

Anisha N. Sims
Vice President Loan Documentation
Wells Fargo Bank, NA
07/24/2013

State of North Carolina      )
County of Mecklenburg        )

The Foregoing instrument was sworn to and subscribed before me this $\underline{24^{th}}$ day of ___July___, 2013, by __Anisha  N.  Sims___ who is personally known to me.

FRANKIE HARRIS
NOTARY PUBLIC
Mecklenburg County, North Carolina
My Commission Expires: 5/1/2017

_____Frankie Harris_____
Notary Public, State of _North Carolina_
My Commission expires: _5/1/2017_

## UNIFORM FORM CERTIFICATE OF ACKNOWLEDGMENT

STATE OF NORTH CAROLINA)
COUNTY OF MECKLENBURG) SS.:

On the $\underline{24^{th}}$ day of _July_ in the year _2013_ before me, the undersigned, personally appeared _Anisha N. Sims_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her/their signature(s) on the instrument, the individual(s), or the personal upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the _Charlotte, North Carolina_. (Insert the city or political subdivision and the state or country or other place the acknowledgment was taken).

_Frankie Harris_
(Notary Public)
My Commission expires: _5/1/2017_

001-NY-V8

FRANKIE HARRIS
NOTARY
PUBLIC
MECKLENBURG COUNTY



Wells Fargo Home Mortgage
P.O. Box 9059
Temecula, Ca 92589-9059

2221837178

July 12, 2009

427/70SDAY30/NY

MICHAEL KRICHEVSKY
4221 ATLANTIC AVENUE
BROOKLYN, NY 11224-1023

Dear Borrower(s):



Our records indicate that your loan is in default. Unless the payments on your loan can be brought current by August 11, 2009, it will become necessary to accelerate your Mortgage Note and pursue the remedies provided for in your Mortgage or Deed of Trust. The total delinquency against your account as of today's date is as follows:

| | | |
|---|---|---|
| Past Due Payments | $ | 13,035.21 |
| Late Charge Balance | $ | 242.52 |
| Other Fees | $ | 0.00 |
| Suspense Balance | -$ | 0.00 |
| Total Delinquency as of July 12, 2009 | $ | 13,277.73 |
| Payments due in next 30 days | $ | 4,345.07 |
| **Total due to cure default and bring loan current as of August 11, 2009** | $ | 17,622.80 |

Your failure to pay this delinquency, plus additional payments and fees that may become due, will result in the acceleration of your Mortgage Note. Once acceleration has occurred, a foreclosure action, or any other remedy permitted under the terms of your Mortgage or Deed of Trust, may be initiated.

You have the right to reinstate your Mortgage Note and Mortgage or Deed of Trust after acceleration. However, any future negotiations attempting to reinstate your loan or any payment of less than the full amount due shall not constitute Wells Fargo Bank, N.A.'s waiver of the acceleration unless agreed to, in writing, by Wells Fargo Bank, N.A. and may be returned. If foreclosure is initiated, you will have the right to refute the existence of a default or offer any other defense to acceleration you may deem appropriate. You have the right to bring a court action to assert the non-existence of a default or any other defense you may have to acceleration and sale.

To avoid the possibility of acceleration you must pay:

$13,277.73 By July 31, 2009, 2:00 P.M. Central Time or
$17,622.80 By August 11, 2009 2:00 P.M. Central Time,

in CERTIFIED funds, to Wells Fargo Home Mortgage, 1 Home Campus, X2302-04A, Des Moines, IA 50328. If funds are not received by the above stated time, we will proceed with acceleration.

We are required by Federal Law to notify you of the availability of government approved home ownership counseling

427.70SDAY30.NYS

agencies designed to help homeowners avoid losing their home. To obtain a list of approved counseling agencies for your state please call 1-800-569-4287. We urge you to give this matter your immediate attention.

If you would like to discuss the present condition of your loan, or if we can be of further assistance, please call our Loan Service Representatives at 1-800-416-1472, Monday through Friday, 8:00 AM to 8:00 PM, Central Time. This communication is an attempt to collect a debt and any information obtained will be used for that purpose. However, if you have received a discharge of this debt in bankruptcy or are currently in a bankruptcy case, this notice is not intended as an attempt to collect a debt and, this company has a security interest in the property and will only exercise its rights as against the property.

Sincerely,

Wells Fargo Home Mortgage
Default Management Department

427.70S.DAY30.NY.2